147 So.2d 776 (1962)
Paul P. DOERLE, Plaintiff-Appellee,
v.
STATE of Louisiana through the DEPARTMENT OF HIGHWAYS, et al., Defendant-Appellant.
No. 714.
Court of Appeal of Louisiana, Third Circuit.
December 18, 1962.
Helm, Simon, Caffery & Duhe, by Lawrence P. Simon and Patrick T. Caffery, New Iberia, for defendant-appellant.
William J. Doran, Jr., State of La., Dept. of Highways, Baton Rouge, for defendant-appellant.
*777 Mestayer & Simon, by Ray F. Mestayer, New Iberia, for plaintiff-appellee.
Before TATE, FRUGÉ and SAVOY, JJ.
SAVOY, Judge.
This matter is on appeal by one of the defendants, the State of Louisiana, Through the Department of Highways. The district judge granted the plaintiff a judgment in the sum of $50,000.00 against the State of Louisiana.
In his reasons for judgment the trial judge did not itemize the various items sued for by plaintiff. After reviewing the record in the instant case, we are of the opinion that the trial judge, in his written reasons for judgment, thoroughly analyzed the evidence as to the liability of the defendant, and we hereby adopt his reasons as our own:
"This suit arises out of a collision between a stationwagon owned by plaintiff and a truck owned by the State of Louisiana. Plaintiff was authorized to file this suit by Act 317 of the 1960 Legislature of the State of Louisiana. Originally, this suit was filed against the State of Louisiana and its insurer, Insurance Company of the State of Pennsylvania, but by a decree dated September 14, 1961, maintaining a plea of prescription, these proceedings were dismissed as to the said insurance company.
"Briefly stated, the undisputed facts are: on June 24, 1958, at approximately 1:30 o'clock, P. M., Gerald Vaughn was driving a 1953 Mercury stationwagon on Highway 90 in an easterly direction between New Iberia, Louisiana, and Jeanerette, Louisiana. The stationwagon belonged to the plaintiff, Paul P. Doerle, who was riding in his automobile. He was seated on the front seat next to the driver, Gerald Vaughn. At the same time, at a point on said highway approximately three miles east of New Iberia, three dump trucks and a water truck belonging to the State of Louisiana were parked on the shoulder of the road on the south side thereof, and headed in an easterly direction. These trucks were parked two or three feet away from the edge of the paved portion of the highway approximately five feet apart, except that the last truck was parked about fifteen feet behind the preceding one. The easternmost, or first truck, headed towards Jeanerette was being operated by Walter Peltier, an employee of the State of Louisiana in the Department of Highways. Walter Peltier, intending to drive his truck across the highway into a private driveway, which is in the shape of a semi-circle, in order to re-enter the highway on the north side thereof from the said driveway to proceed thereon in a westerly direction, made a sharp left turn onto the highway and traveled diagonally across it until the front end thereof reached a point approximately two feet across the center line of the highway, at which point the collision occurred. The right front end of the automobile collided with the truck at or near the center of the left door of the cab. Before the collision occurred, plaintiff's automobile was traveling in its proper lane or in the south lane of the highway. Probably it veered slightly to the left thereof immediately before the impact.
"Plaintiff's theory of the case is that the sole and proximate cause of the accident was the negligence of Walter Peltier in attempting to enter upon and make a left turn across the highway without first ascertaining that it could be done in safety and without endangering plaintiff and his property, and his failure to yield the right-of-way to plaintiff's approaching vehicle.
"Defendant denies any negligence on the part of its employee, Walter Peltier, and asserts that the sole and proximate cause of the accident was the joint concurring negligence of plaintiff and the driver of his automobile, Gerald Vaughn, his employee. Defendant claims that plaintiff's automobile was being driven at an excessive rate of speed under the circumstances, which are detailed in defendant's answer. In the alternative, should it be found that Walter Peltier was guilty of any act or acts of *778 negligence, defendant pleads contributory negligence on the part of Gerald Vaughn (which defendant claims is imputable to plaintiff) and the independent contributory negligence of plaintiff himself as set out in Article 31 of defendant's answer. Defendant also pleads, in the alternative, that plaintiff and his driver had the last clear chance to avoid the accident.
"As is not unusual in such cases, the evidence offered by both parties in this case is most conflicting and, in many respects, inconsistent. Accordingly, it is most difficult to arrive at a correct conclusion concerning the actual facts which are pertinent to a decision.
"In defense of the action of Walter Peltier in making a sharp left turn upon the highway without first ascertaining that he could do so in safety, defendant relies partly upon the provisions of LSA-R.S. 32:246, which are to the effect that the regulatory provisions of Chapter 1 of Title 32 of the Revised Statutes of Louisiana do not apply to persons or vehicles actually engaged in work upon the surface of the highway. However, the preponderance of the evidence indicates that at the time of the collision which forms the basis of this suit, the crew of the Highway Department was not actually engaged in work upon the surface of the highway. The crew had completed the work on the surface of the highway and they were making necessary preparations to move to some other location. Accordingly, Walter Peltier was not exempt from the traffic regulations embodied in Title 32 of the Revised Statutes of Louisiana. (In this connection, see Maryland Casualty Company v. Allstate Insurance Company, La.App., 96 So.2d 340.)
"In further defense of Walter Peltier's action in making a sharp left turn on the highway, defendant relies upon an alleged conversation between him and Clarence Dorsey, who was employed as a flagman, and the actions taken by Dorsey pursuant thereto to warn motorists to come to a stop before reaching the point at which he was standing. According to Peltier, this conversation took place when he was in front of his truck. Clarence Dorsey testified that he was to the east of and near the patch that had been made on the road when he flagged plaintiff's car. Therefore, according to this testimony, Dorsey had to walk from in front of Peltier's truck to that point, on the shoulder of the road, before he attempted to flag plaintiff's automobile. Dorsey testified, `Peltier went to his truck and turned around. Before I got in the middle of the pave there was the fellow for me to make stop.' C. A. Burleson, a disinterested witness called by the defendant, testified that Dorsey was `walking out'. The sum and substance of this testimony is that, if Dorsey flagged plaintiff's car, he flagged it too late to permit it to be stopped before it reached Peltier's truck on the highway.
"My conclusions from this and other testimony is that defendant's employee, Walter Peltier, was negligent, and that his negligence constituted, if not the sole proximate cause of the accident, a proximate cause thereof, so that there remains to be seen whether plaintiff's driver, Gerald Vaughn was guilty of contributory negligence or that he had the last clear chance to avoid the accident.
"As the doctrine of `last clear chance' is a qualification of the rule which bars recovery by a plaintiff if he has been guilty of contributory negligence, I doubt its applicability when pleaded by a defendant, as in this case. Be that as it may, in this case it is obvious from the evidence adduced that Gerald Vaughn could not possibly avert the accident once he discovered the peril.
"In order to determine whether plaintiff and his driver were guilty of such contributory negligence as would bar plaintiff from recovery of the damages he allegedly sustained in the accident, it is necessary to carefully review and scrutinize the testimony which was adduced at the trial *779 in order to arrive at plausible conclusions as to the facts which actually existed at and immediately before the accident.
"Exalta Romero, Sr., the foreman on the job, testified that at the time of the accident the flagman, Clarence Dorsey, was standing approximately forty (40) feet toward New Iberia from the last truck and everybody was off of the highway. Clarence Dorsey testified that he was standing near and on the east side of the patch which had been made on the road next to a one-way stop sign. C. A. Burleson, a disinterested witness called by defendant, testified that he passed the scene of the accident about ten or fifteen minutes before it occurred and drove into his yard, which is nearby. When he reached that point, the employees were bunched up off the road. Immediately before the accident, two or three people were standing in a bunch between a couple of trucks. Only the flagman was on the road. He did not see any barricade on the road. Before the accident, he saw a sign down the road on the shoulder thereof. After the accident, he saw more signs on the road, but he does not know if they were there before, as he did not notice them at first. When the accident occurred, the flagman was twenty (20) feet behind the last truck and on the road. The flagman was not on the road when he came to the scene of the accident, approximately ten minutes before. Immediately before the accident, the flagman was on the edge of the pavement. He had just walked out there and he was holding the flag.
"The most plausible conclusion to be drawn from this and other testimony in the record is that a short while before plaintiff's automobile reached the point at which the accident occurred, there were no signs or barricades on the traveled portion of the highway, and the employees of the defendant, who were bunched up and talking somewhere on the shoulder of the road, decided to move away from the location. It was then that Peltier told Dorsey of his intention to move his truck. Dorsey then proceeded on the shoulder of the road in the direction of New Iberia to take his position on the west side of the last truck so as to flag the eastbound traffic until Peltier had moved his truck. However, before reaching that point, he realized that the oncoming vehicle of plaintiff would not stop, so he moved from the shoulder of the highway onto the traveled portion thereof at a point near where it had been patched and raised the flag which he had in his hand. But evidently it was too late to permit the driver of plaintiff's vehicle to stop short of the point of impact. In this connection, C. A. Burleson further testified that when he first saw plaintiff's automobile, it was two or three hundred feet away. Before the accident the horn of plaintiff's car was being blown and the brakes were applied (squealed). Plaintiff's car was traveling at about sixty miles per hour when he first saw it, but at the time of the collision, he must have been traveling at about twenty, or twenty-five miles per hour. There were skid marks on the highway. The skid marks started in the south lane and gradually crossed over until they went over to the north lane a foot or two. As quickly as the truck started out, the driver of plaintiff's car applied his brakes. He was then approximately one hundred yards away, and he skidded fifty or seventy-five feet.
"With the exception of one witness, none testified that Gerald Vaughn was driving plaintiff's car at a speed exceeding the speed limit of sixty miles per hour. Gerald Vaughn and plaintiff Paul Doerle testified that before reaching the area where the trucks were parked, they were traveling at about fifty-five miles, per hour. Clarence Dorsey likewise estimated the speed of the automobile at fifty-five miles, per hour. Gerald Vaughn testified that when he noticed the trucks on the shoulder of the highway, he slowed his speed down to about forty-five miles, per hour.
"The following facts were established by a preponderance of the evidence: the highway at the point where the accident occurred and for quite a distance to the east and west thereof, is straight and wide. The *780 center thereof is surfaced with concrete, which is flanked by wide shoulders. On the day of the accident, the weather was clear and warm. A crew of workers, who had been engaged in repair work on the south side of the highway, were assembled on the shoulder of the road near a part of the equipment which had been used by them and which consisted of three dump trucks, a water truck and a roller, which was to be attached to the rear of the last dump truck. All of the trucks were headed east and were parked on the south shoulder of the road approximately two or three feet away from the paved portion of the highway, and approximately five feet apart from each other, except that the water truck was approximately fifteen feet behind the third dump truck to allow the roller to be hooked behind the third dump truck. There were, at one time or another, highway warning signs on the shoulder of the road beginning at a point approximately five hundred (500) feet away from the site of the accident.
"My impression is, that for a period exceeding twenty (20) minutes before the accident occurred, the highway crew had completed its work, removed the barricade which had been placed at the spot where the road repairs had been made and the other signs which had been placed on the shoulder or shoulders of the road as well. The members of the crew were close together on the shoulder of the road near the spot at which repairs had been made. They were talking. They were about to move to some other location. When Peltier decided to move on, he told Dorsey of his intention to do so, and proceeded to walk to his truck. Dorsey then proceeded to walk in a westerly direction on the shoulder of the road with the intention of reaching a point beyond the water truck, where he could best safely stop traffic coming from the direction of New Iberia in order to permit the truck that Peltier was driving, as well as the other trucks, to move onto the paved part of the highway from their parked position on the shoulder of the road. Peltier, instead of waiting long enough to assure that the flagman, Dorsey, had reached a point where he could effectively stop traffic coming from the west, got into his truck and quickly made a very sharp left turn upon the highway.
"By a preponderance of the evidence, it was established that Gerald Vaughn was not exceeding the speed limit at any time; that he slowed down his vehicle to approximately forty-five miles, per hour, when he observed that there were highway trucks on the road; that he applied his brakes as soon as he saw that Peltier was moving his truck onto the paved portion of the highway and did all that he could possibly do under the circumstances to avoid the collision.
"Gerald Vaughn's testimony to the effect that there were only three trucks on the shoulder of the road, and that the middle one pulled out is contrary to the actual facts. However, this is merely an indication that he did not closely observe how many trucks were actually on the road. The same may be said about his statement to the effect that he did not see any men on the shoulder of the road, if, as a matter of fact, these men were so situated on the road that he should have seen them when he perceived the trucks on the shoulder thereof. However, it should be remembered that there is testimony to the effect that these men were `bunched' together on the shoulder of the road near the point at which the road had been patched between two of the three trucks and, therefore, it is entirely possible that Vaughn could not see them. Be that as it may, the fact remains that, if Vaughn was negligent in failing to notice these men and to see four trucks instead of three, his negligence in that respect did not constitute a proximate cause of the accident. Vaughn also testified that he did not see any warning signs on the shoulder of the road. C. A. Burleson, a witness called by the defendant, testified that he saw one sign on the shoulder of the road approximately fifteen minutes before the accident and later, when returning to New Iberia, he saw two or three more signs. There were other witnesses *781 who testified that they had not seen any signs. This brings me to the conclusion that all warning signs had been picked up shortly before the accident occurred, as the crew was ready to move on.
"Except for the testimony concerning the actions of the flagman immediately before the collision, I find nothing in the record to convince me of the existence of any fact or circumstance which would have put a reasonable person on notice of the possibility, much less the probability, that one of the trucks which were on the shoulder of the road would suddenly, and without any warning, move almost diagonally on and across the highway. Such a maneuver is simply unthinkable.
"In this connection, I quote with approval the following from page 474 of the Louisiana Law Review, Volume 22:
"`The Louisiana courts, viewing the left turn as a highly dangerous maneuver, have placed a high degree of responsibility upon a motorist turning left to "see to it" that his turn is safely made. So onerous is this standard of care that involvement in a collision while turning left gives rise to a presumption of fault. In absence of a showing that the conduct of the non-turning motorist bordered on "wilful and wanton" indifference to the safety of others, the courts tend to minimize negligence on the part of the non-turning driver except where he was attempting to over-take at an intersection. Even then, the doctrine of last clear chance may be available to him.'
"Therefore, it is my opinion that defendant has failed to prove contributory negligence on the part of either plaintiff or the driver of his automobile, Vaughn.
"The law and jurisprudence applicable to this case is so well fixed, that I deem it unnecessary to comment thereon."

QUANTUM
Dr. Edward Weeks Dauterive examined plaintiff shortly after the accident. He found a large laceration involving the right cheek and right nose, and part of the lip. Plaintiff was bleeding profusely at the time. The laceration was treated in a routine fashion, that is, by suturing. The right lower extremity was x-rayed and the x-ray film revealed that plaintiff suffered a fracture dislocation of the right hip. The plaintiff remained in the hospital until July 16, 1958, or for a period of 53 days. The witness testified that he treated the plaintiff for pulmonary thrombosis two or three months following the accident. It was the doctor's opinion that this condition was related and resulted from the accident which occurred in the instant case. The doctor had treated plaintiff previously for prostate trouble. The doctor also testified that plaintiff was suffering from Parkinson's disease but that it did not interfere with his moving about; that he had also operated on plaintiff for a hernia; that since the accident plaintiff has been incapacitated from performing normal functions such as ambulating. The plaintiff has a walker, which is a pair of parallel bars set on wheels. That is the only way plaintiff can walk. The doctor found that plaintiff was permanently and totally disabled as a result of the accident.
Plaintiff was 70 years of age at the time of the accident and his life expectancy was approximately 8½ years. LSA-R.S. 47:2405. Prior to the accident plaintiff was fairly active, being engaged in selling jewelry to retail establishments, which required him to travel. Prior to the accident he was able to drive his car, but employed Gerald Vaughn as a driver and general helper. After the accident his family doctor was of the opinion that he could never again drive an automobile or otherwise engage in his usual activities and occupation.
Counsel for plaintiff and defendant stipulated that from the period commencing *782 June 24, 1958, to October 31, 1961, inclusive, plaintiff had expended the sum of $13,247.53 for hospital expenses, physician's fees, nursing fees, drugs and other related items, less $1,750.00 for unrelated items, or a total of $11,497.53. After reviewing the stipulation, we find that the sum total of the above expenses appears to be $11,097.53. It was also stipulated that the damages to the plaintiff's automobile as a result of the accident in the instant case total $550.00.
Counsel for both parties also stipulated that the net income of plaintiff for the years 1954, 1955, 1956 and 1957, respectively, was, in round figures, $2,814.00, $2,185.00, $1,679.00 and $1,558.00. Plaintiff's average net income for the years 1954 through 1957, inclusive, was approximately $2,000.00 a year.
From the stipulation as to wages, it appears that as the plaintiff grew older, his net income lessened. This would be normal for as the plaintiff became older, he would become less active and probably spend less time on the road selling merchandise.
The record also reveals that the plaintiff has had in his employ since the accident a lady who takes care of him, and that he has been paying her $25.00 per week, plus board and lodging. As plaintiff grows older, the Parkinson's disease will become more aggravated, and even if the accident had not occurred, there would still be a need for someone to take care of plaintiff, for this is a progressive disease which worsens with time.
Considering the life expectancy of plaintiff, the condition of his health prior to and after the accident, and the fact his earning power will decrease with age as is shown by his earnings for the period 1954 through 1957, inclusive, this Court is of the opinion that an award of $40,000.00 for medical expenses, loss of earnings, pain and suffering, and physical disability is reasonable.
Counsel for defendant contends that the award should be reduced drastically for the reason that plaintiff is receiving social security from the Federal Government and also is receiving a monthly payment for disability from an insurance company. We cannot take this into consideration in awarding damages in the instant case. It is well settled that the wrongdoer is not entitled to have the damages for loss of earnings and loss of earning power reduced by compensation or pension payments paid to the injured party from a collateral source to which the wrongdoer does not contribute. See 25 C.J.S. Damages § 99; and 15 Am.Jur. Damages, § 201.
For the reasons assigned, the judgment of the district court is amended by reducing the award from the sum of $50,000.00 to the sum of $40,000.00, and as amended is affirmed.
Amended and affirmed.