879 So.2d 692 (2004)
Linda BOZEMAN, Individually and on Behalf of Tommy Bozeman
v.
STATE of Louisiana, and the Department of Transportation and Development.
No. 2003-C-1016.
Supreme Court of Louisiana.
July 2, 2004.
Rehearing Denied September 3, 2004.
*693 Jack M. Bailey, Jr., James A. Cooper, Jr., Shreveport, Mary Lou Salley, Counsel for Applicant.
Claude W. Bookter, Jr., Shreveport, Charles Foti, Jr., Attorney General, LaVon D. Raymond, Counsel for Respondent.
David A. Abramson, Stevan C. Dittman, New Orleans, Counsel for Louisiana Trial Lawyer's Association (Amicus Curiae).
JOHNSON, Justice.
This personal injury case is the first instance where this court has addressed the application of the collateral source rule to medical expenses "written-off" or contractually adjusted by healthcare providers pursuant to the federal Medicaid program. Under the collateral source rule, a tortfeasor may not benefit, and an injured plaintiff's tort recovery may not be reduced, because of monies received by the plaintiff from sources independent of the tortfeasor's procuration or contribution. When an injured plaintiff is a Medicaid recipient, federal and state law require that the healthcare providers accept as full payment, an amount set by the Medicaid fee schedule, which, invariably, is lower than the amount charged by the healthcare provider. The difference between what is charged by the healthcare providers and what is paid by Medicaid is referred to as the "write-off" amount. We granted this *694 writ of certiorari to determine whether this plaintiff, who was a Medicaid recipient, is entitled to recover medical damages that were "written-off" by his healthcare providers, under the collateral source rule. After a thorough review of the record and relevant law, we affirm the lower courts' determinations that Medicaid recipients are unable to recover the "write-off" amounts as damages.

FACTS AND PROCEDURAL HISTORY
Tommy Bozeman was catastrophically injured on May 12, 1993, while driving west on Highway 173, also called Shreveport-Blanchard Road, near its intersection with Industrial Park Drive, just north of Shreveport in Caddo Parish, when his right tires dropped off the paved portion of the highway onto the shoulder just as Mr. Bozeman came upon a curve. As a result of the accident, Mr. Bozeman suffered brain damage, and numerous fractures, bruises, and abrasions.
A helicopter flew Mr. Bozeman from the accident scene to the LSU Medical Center in Shreveport, where he stayed until June 1993. Thereafter, Mr. Bozeman was transferred to Summit, a long-term care facility where he received around the clock care. Mr. Bozeman remained in long-term care facilities, in a semi-conscious state, until his death on August 29, 1996, although he did return to LSU Medical Center in August 1993 for surgery.
On November 2, 1993, Mr. Bozeman, with his wife, Linda Bozeman, as his signing representative, applied for, and was subsequently granted, Medicaid benefits. Ten days later, on November 12, 1993, Linda Bozeman filed a Petition for Personal Injuries against the State of Louisiana, Department of Transportation and Development (DOTD).[1] Subsequently, plaintiff filed second and third supplemental petitions that added Chrysler Corporation, Jeep-Eagle Corporation, and other related co-defendants. By July 1998, all defendants, except for the State of Louisiana, were dismissed. Thus, the State of Louisiana, DOTD, was the sole defendant when the case proceeded to a bench trial on January 19, 2000.
At trial, both parties jointly introduced exhibit J-1, a document from the Louisiana Department of Health and Hospitals (DHH), the agency that administers Louisiana's Medicaid program, which details the medical services of healthcare providers and the amounts paid by Medicaid for Mr. Bozeman's care. The trial court denied the State's request for a credit to DOTD for those amounts paid by Medicaid. Ultimately, the trial court found the State of Louisiana 75% at fault and apportioned 25% of the fault to Mr. Bozeman. Plaintiff was awarded damages and $613,626.64 in medical expenses, which included $498,350.68 from the joint exhibit, J-1, and additional invoices filed into evidence by the plaintiff.
This award was appealed by the State of Louisiana, DOTD, which argued that the trial court erred in its liability determinations and its damages awards, which included *695 the award of $613,626.64 for medical expenses. DOTD asserted that the trial court should have awarded medical expenses against the State of Louisiana for $321,763.08. This figure represents the difference between, $613,626.64, the total amount of Mr. Bozeman's medical expenses, and $291,863.56, the amount of Mr. Bozeman's medical expenses paid by Medicaid, through DHH, as shown on the joint exhibit, J-1.
On April 4, 2001, the Court of Appeal affirmed the trial court's judgment with respect to liability and damages, with the exception of the trial court's award of medical expenses. Bozeman v. State of Louisiana, and the Dep't. of Transp. and Dev., 34,430 (La.App. 2 Cir. 4/4/01), 787 So.2d 357 (hereinafter Bozeman I). The court noted that the trial court's ruling preceded the Second Circuit's opinion in Terrell v. Nanda, 33,242 (La.App.2d Cir.5/10/2000), 759 So.2d 1026, and remanded to the trial court "so that the court may fix the amount of special damages for medical expenses in view of the Terrell opinion and to the extent that that ruling may be applicable." Bozeman I, at 369.
On April 28, 2002, the trial court rendered its ruling. The trial court reduced the medical damages award from $613,626.64 to $344,999.59, after consideration of the Terrell opinion, and held that the medical expenses "written off" pursuant to the Medicaid program requirements are not recoverable by this plaintiff. The trial court rendered a separate ruling on May 14, 2002 denying a Motion to Withdraw Funds filed by the State of Louisiana, Department of Health and Hospitals (DHH). Plaintiff and DHH both appealed these separate rulings which were consolidated on appeal.
In Bozeman v. State of Louisiana, and the Department of Transportation and Development (DOTD), 36,665, 36,803 (La. App. 2 Cir. 3/5/03), 839 So.2d 960, 967, (hereinafter "Bozeman II"), the Court of Appeal affirmed the trial court's rulings, but amended the amount of the medical damages award from $344,999.59 to $355,206.97 to reflect the correct amount of claims paid and denied by Medicaid. Consistent with the Terrell decision, the Court of Appeal held that plaintiff is prevented from recovering those medical expenses that were contractually adjusted or "written-off" by the healthcare providers pursuant to the Medicaid program. The court's reasoning was based on three main factors: (1) the absence of a natural obligation for the "write-off" amount, (2) that no windfall should accrue to either the plaintiff or the defendant when the plaintiff is prohibited from recovering the "write-off" amount, and (3) that federal and state Medicaid statutes dictate that the healthcare providers must accept the payment set by the Medicaid fee schedule as payment in full.
The Court reasoned that the goal of tort recovery is to make the victim whole and "(i)n the instant case, the plaintiff is made whole by recovering the amounts actually paid by Medicaid, which are the only expenses incurred by the recipient under the program." Id. at 966. The Court relied on the discussion in Terrell regarding natural obligations for its conclusion. Similar to the case sub judice, the issue in Terrell was whether plaintiffs in a medical malpractice action could collect medical expenses written off by plaintiff's healthcare providers pursuant to a Medicaid program. Id. at 1027. The Second Circuit held that the plaintiff was unable to recover medical expenses contractually written off pursuant to the Medicaid program.
In Terrell, the Court concluded that no natural obligation existed because there was never any obligation on the part of plaintiffs to satisfy the medical expenses *696 that were written off. The court referred to four requirements that must be present in order for a duty to be considered a natural obligation. Those requirements are the following:
(1) The moral duty must be felt towards a particular person, not all persons in general.
(2) The person involved feels so strongly about the moral duty that he truly feels he owes a debt.
(3) The duty can be fulfilled through rendering a performance whose object is of pecuniary value.
(4) A recognition of the obligation by the obligor must occur, either by performing the obligation or by promising to perform. This recognition brings the natural obligation into existence and makes it a civil obligation. Id. at 1030, citing Litvinoff, The Law of Obligations section 2.4, 5 Louisiana Civil Law Treatise (1992), as cited in Thomas v. Bryant, 25,855 (La.App.2d Cir.6/22/94), 639 So.2d 378.
In Terrell, the court focused on medical expenses "incurred" by the plaintiff. The Court stated that "(a) plaintiff may ordinarily recover reasonable medical expenses, past and future, which he incurs as a result of injury." Id. at 1031, citing Whitthorne v. Food Lion, Inc., 30,105 (La. App.2d Cir.1/21/98), 706 So.2d 193, where incur was defined as "to become liable." According to the Court, there was no liability on the part of the plaintiffs for expenses above those paid by Medicaid. Thus, the Court concluded that the plaintiffs did not "incur" the write-off amounts because there was no natural obligation to pay it.
In Bozeman II, the court also relied on the requirements for participation in the Medicaid program as a basis for its conclusion. According to the court, under state law,[2] healthcare providers "are specifically required to accept Medicaid payment as payment in full and are prohibited from the billing or collecting of additional amounts from the recipient or the recipient's responsible party." Thus, Medicaid provides for full payment to healthcare providers under terms accepted by the providers through their participation in the Medicaid program. As such, "the plaintiff recovers as special damages those medical expenses paid by Medicaid. Nothing more is owed." The Court underscored the statutory language that requires the healthcare provider to accept the Medicaid payment as "payment in full."
Lastly, the Court of Appeal affirmed the trial court's denial of DHH's Motion to Withdraw Funds. The Court of Appeal held that DHH was not a party to this suit and failed to intervene, although it had an opportunity to do so. Id. at 970. The Court relied on Cole v. State ex rel. Dep't. of Transp. and Dev., 99-912 (La.App. 3d Cir.12/22/99), 755 So.2d 315 for the proposition that the trial court is not compelled to award damages to DHH when DHH chooses not to be a litigant in the suit.[3]
*697 Following the Second Circuit's decision, plaintiff, Bozeman, applied for writ of certiorari, which this court granted on June 6, 2003. Bozeman v. State of Louisiana, and the Dep't. of Transp. and Dev., XXXX-XXXX (La.6/6/03), 845 So.2d 1074. DHH failed to seek review of the court's decision.

DISCUSSION
The collateral source rule is a rule of evidence and damages that is of common law origin, yet embraced and applied by Louisiana courts.[4] This court cited the Restatement (Second) of Torts section 920A (1979) as source material for the collateral source rule in Louisiana Dep't of Transp. and Dev. v. Kansas City Southern. Ry., 2002-C-2349 (La.5/20/03), 846 So.2d 734, 739. The Restatement (Second) of Torts codifies the rule as follows:
Section 920A
(1) A Payment made by a tortfeasor or by a person acting for him to a person whom he has injured is credited against his tort liability, as are payments made by another who is, or believes he is, subject to the same tort liability.
(2) Payments made to or benefits conferred on the injured party from other sources are not credited against the tortfeasor's liability, although they cover all or a part of the harm for which the tortfeasor is liable.
*698 Several states modified or abolished the rule during the 1980s in response to the perceived crisis in the insurance industry.[5] By 1987, at least forty-four state legislatures, including Louisiana, had introduced bills to reform the collateral source rule.[6] However, the Louisiana Legislature has declined to make any statutory changes to the rule. Kansas City Southern, supra, at 739.
Under the collateral source rule, a tortfeasor may not benefit, and an injured plaintiff's tort recovery may not be reduced, because of monies received by the plaintiff from sources independent of the tortfeasor's procuration or contribution. Kansas City Southern Ry., supra, at 739. Hence, the payments received from the independent source are not deducted from the award the aggrieved party would otherwise receive from the wrongdoer, and, a tortfeasor's liability to an injured plaintiff should be the same, regardless of whether or not the plaintiff had the foresight to obtain insurance. Id, at 739-740. As a result of the collateral source rule, the tortfeasor is not able to benefit from the victim's foresight in purchasing insurance and other benefits. Suhor v. Lagasse, XXXX-XXXX (La.App. 4 Cir. 9/13/00), 770 So.2d 422,423.
The collateral source rule has been applied to a variety of factual circumstances, although it typically applies to tort cases involving insurance payments or other benefits. In Kansas City Southern Ry., supra, this court applied the collateral source rule to environmental damages under the Louisiana Environmental Quality Act (LEQA). Louisiana's Third Circuit Court of Appeal recently applied the rule in a worker's compensation case involving services provided by the Veterans Administration. Smith v. Roy O. Martin Lumber Co., 03-1441 (La.App. 3 Cir. 4/14/04), 871 So.2d 661. The rule was applied to welfare payments in Bonnet For and Behalf of Bonnet v. Slaughter, 422 So.2d 499, 502 (La.App. 4th Cir.1982). Further, in Bryant v. New Orleans Public Serv. Inc, 406 So.2d 767, 768 (La.App. 4th Cir.1981), the court opined the following:
The collateral source rule has been held to apply not only where plaintiff directly purchased insurance against which the plaintiff recovered, but also where there have been Medicare paymentsWomack v. Travelers Insurance Co., 258 So.2d 562 (La.App. 1st Cir., 1972); sick leave and annual leave paymentsDunlap v. Armendariz, 265 So.2d 352 (La.App. 4th Cir., 1972); retirement pension paymentsAdam v. Schultz, 250 So.2d 811 (La.App. 4th Cir., 1971); free medical services rendered as a professional courtesySpizer v. Dixie Brewing Co., 210 So.2d 528 (La.App. 4th Cir., 1968); Federal Social Security BenefitsDoerle v. State, 147 So.2d 776 (La.App. 3rd Cir., 1962); free medical care rendered by the Veteran's AdministrationFullilove v. U.S. Casualty Co. of N.Y., 129 So.2d 816 (La.App. 2nd Cir., 1961); insurance paid for by the employer for the employee as a result of a collective bargaining agreement in a F.E.L.A. caseHall v. Minnesota Transfer Ry. Co., 322 F.Supp. 92 (D.Minn., 1971); and suits brought under the Jones Act and Longshoremen's and Harbor Worker's Compensation ActTipton v. Socony Mobil Oil Co., 375 U.S. 34, 84 S.Ct. 1, 11 L.Ed.2d 4 (1963). In Bourque v. Diamond M. Drilling Co., 623 F.2d 351 (5th Cir., 1980) the court held that an employer tortfeasor could not violate the collateral *699 source rule by applying as a set-off workmen's compensation benefits received by the former employee from another employer.
In Bryant, supra, the court also provided a lucid discussion of the policy reasons supporting the collateral source rule. The court stated the following:
There are several reasons for the existence of the collateral source rule. The reason most often stated is that the defendant should not recover from outside benefits provided to the plaintiff or procured by the plaintiff. For years the Louisiana courts struggled with the so-called "windfall" or "double-dip" aspect of the collateral source rule only to discover that no "windfall" or "double dip" in fact occurred. No "windfall" or "double dip" occurred because the injured party's patrimony was diminished to the extent that he was forced to recover against outside sources and the diminution of patrimony was additional damage suffered by him.
For example, if the payment received by plaintiff was from annual leave or sick leave time, then those resources which would have been available to him but for the accident or injury, are no longer available and he has suffered the loss of annual or sick leave time for which he should be recompensed. This same logic applies to pension payments, government benefits, and gratuitous services. In the case of insurance purchased by the plaintiff or deductions made from the plaintiff's paycheck, the plaintiff has paid premiums which are a diminution of his patrimony as that cash would have otherwise been available to him. By going against his own insurance policy, he is diminishing the benefits of that policy which would otherwise be available, he has suffered a diminution of the patrimony by premium payments and his rates will rise providing a third area of loss.
Where insurance is provided by the employer, then that fringe benefit is in the nature of deferred compensation. The deferred compensation would have been available to him as cash per paycheck, but for the existence of the deferred compensation plan. Likewise, the benefits of the deferred compensation would have been available but for the injury. Lastly, if the collateral source rule were not applied, then there would be no reason for an individual to purchase insurance. For example, if in a wrongful death case the tortfeasor was allowed a set-off for proceeds from the deceased's life insurance policy, then the deceased's estate suffered the loss not only of the amounts paid as premiums but also for the use of the money over the years, so that the deceased's estate could, theoretically, bring an action against the defendant to recover back the set-off amount.
As stated earlier, the collateral source rule is a rule of evidence and damages. From an evidentiary perspective, the rule bars the introduction of evidence that a plaintiff has received benefits or payments from a collateral source independent of the tortfeasor's procuration or contribution. The issue typically arises at trial following the submission of a Motion in Limine. For example, in Terrell v. Nanda, 33,242-CA (La.App. 2 Cir. 5/10/00), 759 So.2d 1026, 1028, plaintiffs argued that under the collateral source rule they were entitled to contractually adjusted medical expenses. In conjunction with this argument, plaintiffs filed a Motion in Limine to exclude any evidence of Medicaid payments. Id. Similarly, in Suhor v. Lagasse, XXXX-XXXX (La.App. 4 Cir. 9/13/00), 770 So.2d 422, 423, the trial court was called upon to determine what amount of plaintiff's past medical expenses were *700 appropriate to be put into evidence before the jury. Also, in Kansas City Southern Railway, supra, DOTD argued that under the collateral source rule, the liability of the wrongdoer, Kansas City Southern, should not be reduced due to clean-up costs paid by a collateral source, the Federal Highway Administration (FHWA). Id. at 739. In response to the assertion that DOTD could not recover the clean-up costs paid by FHWA, DOTD filed a Motion in Limine seeking to withhold from the jury evidence of FHWA's payments. Id. at 737.
In the present case, plaintiff and defendant entered a 156 page joint exhibit, referred to as J-1, that outlined the plaintiff's total medical expenses and what was paid and denied by Medicaid. The printout was from the Louisiana Medicaid Management Information Systems and showed that 1093 claims were submitted to Medicaid for $622,086.89. Medicaid paid $319,838.46 and denied claims totaling $35,368.51. Claims in the amount of $266,879.923 were written off by the healthcare providers. Plaintiff now seeks to recover this amount.
From an evidentiary perspective, there is no dispute here, since the evidence of the collateral source payments was jointly introduced at trial. Thus, we are called upon to make a determination regarding the damages aspect of the collateral source rule.
The major policy reason for applying the collateral source rule to damages has been, and continues to be, tort deterrence. The underlying concept is that tort damages can help to deter unreasonably dangerous conduct.[7] Tort deterrence has been an inherent, inseparable, aspect of the collateral source rule since its inception over one hundred years ago.
The origins of the collateral source rule can be traced to a decision by the United States Supreme Court in 1854, The Propeller Monticello v. Mollison, 58 U.S. (17 How.) 152, 15 L.Ed. 68 (1854). This case arose from a shipwreck involving a steamship, The Propeller Monticello, and a schooner ship named the Northwestern. Both ships carried cargo, and the schooner, which sank, was insured. The schooner's insurer paid for the loss of the schooner and its cargo prior to the filing of the suit, which was initiated by the schooner's owner. As a defense, the steamship's owner argued that the insurance pay-off released it from liability. The Supreme Court disagreed, and held instead that the schooner's "contract with the insurer is in the nature of a wager between third parties, with which the trespasser has no concern. The insurer does not stand in the relation of a joint trespasser, so that satisfaction accepted from him shall be a release of others." Id. at 155. Further, the Supreme Court concluded that the tortfeasor "is bound to make satisfaction for the injury he has done." Id.
Louisiana courts have followed this logic. In Kansas City Southern Railway, Co., supra, at 739, this court concluded that "(i)t is clear that the collateral source rule promotes tort deterrence and accident prevention." Further, this court held that "our holding today is commanded by the paramount public interest in ensuring that those persons or entities responsible for harming our environment and the welfare of our citizens be held fully responsible for the consequences of their actions, and deterred from committing future violations." Id. In Suhor v. Lagasse, supra, the Louisiana *701 Fourth Circuit Court of Appeal opined that "the main policy reasons for the collateral source rule are grounded in the belief that the tortfeasor should not profit from the victim's prudence in obtaining insurance, and that reducing the recovery by the monies paid by a third party would hamper the deterrent effect of the law." Id. at 424. Both in Louisiana and in common-law courts, the jurisprudence is inconsistent regarding the medical expenses written-off by healthcare providers pursuant to the Medicaid agreement. Three approaches have developed among courts in deciding whether or not to apply the collateral source rule to Medicaid "write-offs." We refer to these approaches as (1) reasonable value of services, (2) actual amounts paid, and (3) benefit of the bargain. As will be explained below, we embrace the latter, benefit of the bargain.

Reasonable Value of Services
The first approach taken by courts, and urged by the plaintiff in the case sub judice, is to award plaintiffs the entire amount of the medical expenses that were billed to the plaintiff, including those amounts that were written off by healthcare providers. The Wisconsin Supreme Court adopted this reasoning in Koffman v. Leichtfuss, 2001 WI 111, 246 Wis.2d 31, 630 N.W.2d 201, where the court held that "(t)he rule of valuation of medical expense damages, the collateral source rule, and the principles of subrogation lead us to the conclusion that the plaintiff may seek recovery of the reasonable value of medical services rendered, without limitation to the amounts actually paid by the plaintiff's insurers." Similarly, the South Carolina Supreme Court, in Haselden v. Davis, 353 S.C. 481, 579 S.E.2d 293 (2003), embraced this logic in addressing the distinction between the amount a healthcare provider bills, and, what opponents of applying the collateral source rule to Medicaid "write-off" amounts suggest is the true value of a plaintiff's injuries. The Court stated the following:
To hold that the plaintiff is limited to damages in the amount actually paid by Medicaid is contrary to the purposes behind the collateral source rule and would result in a windfall to the defendant tortfeasor. In our view, a defendant physician who agrees to become a Medicaid provider, thereby agreeing to accept as compensation for medical services those amounts set forth in the Medicaid agreement, who thereafter bills a Medicaid patient for the full value of his services, may not claim that the true, reasonable value of those services is the lesser amount paid by Medicaid. Id. at 485, 579 S.E.2d 293.
In holding that the trial court did not err in admitting plaintiff's medical bills which exceeded the amount paid by Medicaid, the Mississippi Supreme Court, in Brandon HMA, Inc. v. Bradshaw, 809 So.2d 611, 618 (Miss.2001), held that "(t)here is no reason why Medicaid benefits should be treated any differently than insurance payments, and they should be subject to the collateral source rule." Further, the court stated that the tortfeasor "does not get a break on damages just because it caused permanent injuries to a poor person." Id. at 619. The rationale behind this policy of awarding the plaintiff the reasonable value of his medical services rather than the amount actually paid is more fully explained in comment b to the Restatement (Second) of Torts, Section 920A, that states,
If the plaintiff was himself responsible for the benefit, as by maintaining his own insurance or by making advantageous employment arrangements, the law allows him to keep it for himself. If the benefit was a gift to the plaintiff *702 from a third party or established for him by law, he should not be deprived of the advantage that it confers. The law does not differentiate between the nature of the benefits, so long as they did not come from the defendant or a person acting for him. (Emphasis added)
The same logic was espoused by this court in Kansas City Southern Ry., supra, at 743, where this court stated that "(a) wrongdoer's liability should not be reduced by the amount of collateral source payments to an injured plaintiff, even where the nature of the collateral source is a public relief provided to the plaintiff by application of federal or state law." (Emphasis added). The court emphasized that "our holding today is a narrow one addressing the applicability of the collateral source rule in the circumstances of this case." Id. at 745.
In the case sub judice, plaintiff embraces the above argument. Plaintiff argues that the focus of this case should be on the reasonable value of plaintiff's services, not what was actually paid, or what was actually incurred. Plaintiff suggests that even the reasonable value of services, or what the healthcare providers billed, is unable to fully compensate for the injuries in this case since the unfortunate victim, Tommy Bozeman, ultimately died from his injuries. Nonetheless, plaintiff asserts that they are entitled to the full value of medical services, not simply what was paid, and, that this position is consistent with Louisiana's jurisprudence regarding the collateral source rule and other benefits, such as worker's compensation and sick leave.
The plaintiff further argues that the victim's patrimony was diminished in order for the victim to receive the Medicaid benefits since the victim had to spend whatever resources he had to qualify for Medicaid and the Medicaid program is financed through taxes that the victim paid during his working life. We reject plaintiff's arguments for reasons that are explained more fully below.

Actual Amounts Paid
The second approach taken by courts, and urged by defendant in the case sub judice, is to deny the plaintiff the ability to recover the write-off amounts because the plaintiff did not incur the "write-off" amount, thus, resulting in a windfall for the plaintiff, if the plaintiff was allowed to recover. The Idaho Supreme Court used this logic in deciding Dyet v. McKinley, 139 Idaho 526, 81 P.3d 1236, 1239 (Id. 2003), where the court held that "(a)lthough the write-off technically is not a payment from a collateral source within the meaning of the collateral source statute, it is not an item of damages for which plaintiff may recover because plaintiff has incurred no liability therefore."
In the case sub judice, the Louisiana Second Circuit Court of Appeal, agreed that the goal of tort recovery is to make the victim whole and that goal would not be served by allowing recovery of a non-existent debt." Bozeman II, at 966. The Second Circuit agreed with the Louisiana Fourth Circuit Court of Appeal ruling that "a plaintiff may not recover as damages that portion of medical expenses `contractually adjusted' or `written off' by a healthcare provider pursuant to the requirements of the Medicaid program. Such expenses are not damages incurred by the plaintiff and are not subject to recovery by application of the collateral source rule." Terrell v. Nanda, supra, 759 So.2d at 1031.
Defendant, DOTD, adheres to this reasoning. DOTD argues that the Medicaid "write-off" amount is an illusory amount that is simply used by healthcare providers to set their fee payments with Medicaid. DOTD argues that the plaintiff never incurred *703 this bill, and by operation of state and federal law, the Medicaid provider is required to accept as full payment the amount paid by Medicaid, and no more. Thus, to allow the plaintiff to recover this additional amount would violate the law of compensatory damages, which is to make the plaintiff whole. According to defendant, allowing plaintiff to recover an amount that neither he nor anyone was ever obligated to repay, an amount over and above what was actually paid for his medical expenses, would be to grant the plaintiff a windfall because plaintiff would recover damages in excess of what it took to make the plaintiff whole, thus, violating the goal of tort recovery. We disagree.
The Wisconsin Supreme Court in Koffman v. Leichtfuss, supra, 246 Wis.2d at 47, 630 N.W.2d 201, held that the collateral source rule "is grounded in the long-standing policy decision that should a windfall arise as a consequence of an outside payment, the party to profit from that collateral source is the person who has been injured, and not the one whose wrongful acts caused the injury." Similarly, the Kansas Supreme Court held that "(i)f there is to be a windfall, it should benefit the injured party rather than the tortfeasor." Rose v. Via Christi, 276 Kan. 539, 544, 78 P.3d 798. Likewise, the Montana Supreme Court concluded that "(t)he principle behind the collateral source rule is that it is better for the wronged plaintiff to receive a potential windfall than for a tortfeasor to be relieved of responsibility for the wrong. Five U's Inc. v. Burger King Corp., 290 Mont. 452, 455, 962 P.2d 1218.
Thus, the proper focus of our inquiry is "on the nature of the write-offs vis-a-vis the tortfeasor, rather than vis-a-vis the tort victim," as stated by the Louisiana First Circuit Court of Appeal, in Griffin v. The Louisiana Sheriff's Auto Risk Assoc., 1999 CA 2944 (La.App. 1 Cir. 6/22/01), 802 So.2d 691, 715. The court further determined that when courts approach the problem with this focus,
the application of the collateral source rule makes more sense and is more appropriate. This rationale can best be understood by analyzing the write-offs in two situations: one in which a tortfeasor injures an uninsured victim and the other in which the same tortfeasor, in the same manner and to the same extent, injures an insured victim. Unless the write-offs are considered collateral sources, the tortfeasor would be relieved of his liability to the insured victim to the amount of the write-offs. The argument that there is no underlying obligation for plaintiff to pay the amount of the write-offs and, therefore, the plaintiff should not be allowed to benefit from a non-existent debt, falls because the effect of this reasoning results in a diminution of the tortfeasor's liability vis-a-vis an insured victim when compared with the same tortfeasor's liability vis-a-vis an uninsured victim.

Benefit of the Bargain
The third approach used by courts is to award plaintiffs the full value of their medical expenses, including the "write-off" amount, where the plaintiff has paid some consideration for the benefit of the "write-off" amounts. Louisiana's First Circuit Court of Appeal adopted this rationale in Griffin, supra, when it concluded that the plaintiff's patrimony was continually diminished to the extent that she had to pay premiums in order to secure the benefits of her insurance. Id. at 714. According to the First Circuit, to the extent that the write-offs were procured through the payment of the premiums, they can not properly be considered a windfall. Rather, the write-off amount was viewed as a benefit *704 to plaintiff's contractual bargain with her insurance provider.
Similarly, the Virginia Supreme Court, in Acuar v. Letourneau, 260 Va. 180, 531 S.E.2d 316, 322-323 (2000), concluded the following:
we conclude that Acuar (the tortfeasor) cannot deduct from that full compensation any part of the benefits Letourneau (the victim) received from his contractual arrangement with his health insurance carrier, whether those benefits took the form of medical expense payments or amounts written off because of agreements between his health insurance carrier and his health care providers. Those amounts written off are as much of a benefit for which Letourneau paid consideration as are the actual cash payments made by his health insurance carrier to the health care providers. The portions of medical expenses that health care providers write off constitute `compensation or indemnity received by a tort victim from a source collateral to the tortfeasor.
Additionally, the Virginia Supreme Court stated that this conclusion is consistent with the purpose of compensatory damages, which is to make the victim whole. The court noted that "the injured party should be made whole by the tortfeasor, not by a combination of compensation from the tortfeasor and collateral sources. The wrongdoer cannot reap the benefit of a contract for which the wrongdoer paid no compensation." Id. at 323. Further, the California Supreme Court, in Helfend v. S. California Rapid Transit District, 2 Cal.3d 1, 84 Cal.Rptr. 173, 465 P.2d 61, 66-67 (1970) made specific reference to insurance and other benefits being an investment made by the plaintiff, for which the plaintiff should get the benefit. The California Supreme Court stated the following:
The collateral source rule expresses a policy judgment in favor of encouraging citizens to purchase and maintain insurance for personal injuries and for other eventualities. Courts consider insurance a form of investment, the benefits of which become payable without respect to any other possible source of funds. If we were to permit tortfeasor to mitigate damages with payments from plaintiff's insurance, plaintiff would be in a position inferior to that of having bought no insurance, because his payment of premiums would have earned no benefit. Defendant should not be able to avoid payment of full compensation for the injury inflicted merely because the victim has had the foresight to provide himself with insurance.
We embrace this reasoning for plaintiffs who have paid some consideration for the collateral source benefits, including the "write-off." In the case sub judice, this conclusion would prohibit the plaintiff, a Medicaid recipient, from recovering the "write-off" amount. Several courts have distinguished Medicaid benefits from Medicare and private insurance.
The Supreme Court of Kansas, in Rose v. Via Christi, 276 Kan. 539, 552, 78 P.3d 798 (2003), concluded that based upon the payment of premiums by Medicare participants, "we find that Medicare is akin to private insurance and can be distinguished from Medicaid in that regard." Id. at 543, 78 P.3d 798. Also, the Louisiana Fourth Circuit Court of Appeal in Suhor v. Lagasse, supra, at 425, stated that "(a)lthough many people confuse the two programs, Medicare and Medicaid are not the same. While Medicare is a federal basic health insurance program for persons 65 and older and for many people with disabilities, Medicaid is a `health care program for people with low income and limited assets' usually run by state welfare *705 or social service agencies." A clear discussion of this distinction is provided by the Ohio Supreme Court in Hodge v. Middletown Hospital Assoc., 91-3232 (1991), 62 Ohio St.3d 236, 240, 581 N.E.2d 529. The court stated that,
Medicare Part A is a federal program which pays hospital and related benefits to individuals age 65 or over and certain others who meet eligibility requirements. It is financed by compulsory payroll taxes administered through the Federal Hospital Insurance Trust Fund. Medicare Part A is described as follows: The insurance program which provides basic protection against the costs of hospital, related post-hospital, home health services, and hospice care. 42 USC 1395c. The tenth circuit court of appeals in Martinez v. Richardson (1973), 472 F.2d 1121, 1123, described Medicare as "an Act of 1965 to protect individuals 65 years of age and over from the high cost and the hardship of illness. Part A is a program of hospital insurance. It has a trust fund, the source of which is taxes paid by the employees, employers and self-employed persons. The benefits available under Part A include hospital coverage and a variety of post-hospital home health care services." (Emphasis added)
Additionally, the Ohio Supreme Court stated that,
Medicaid payments, however, are significantly different from benefits paid as Medicare Part A. Medicaid is a system for providing payment of medical costs for the poor. Neither the beneficiary nor his employer pays premiums or underwrites the cost of the program... Payment into the (Medicare) trust fund, though involuntary, is in exchange for health care coverage, and gives rise to a duty on the part of the government to pay benefits when required. In addition, the language of the statute specifically refers to "policy or contract" of insurance. In short, Medicare Part A is funded by payments made by beneficiaries and their employers, is actuarily determined, and is described by its enabling statute as insurance. Id. at 240-241, 581 N.E.2d 529. (Emphasis added)
Care of the nation's poor is an admirable social policy. However, where the plaintiff pays no enrollment fee, has no wages deducted, and otherwise provides no consideration for the collateral source benefits he receives, we hold that the plaintiff is unable to recover the "write-off" amount. This position is consistent with the often-cited statement in Gordon v. Forsyth County Hospital Authority, Inc., 409 F.Supp. 708 (M.D.N.C.1975), affirmed in part and vacated in part, 544 F.2d 748 (4th Cir.1976), that "(i)t would be unconscionable to permit the taxpayers to bear the expense of providing free medical care to a person and then allow that person to recover damages for medical expenses from a tort-feasor and pocket the windfall." (Emphasis added). After careful review, we conclude that Medicaid is a free medical service, and that no consideration is given by a patient to obtain Medicaid benefits. His patrimony is not diminished, and therefore, a plaintiff who is a Medicaid recipient is unable to recover the "write off" amounts. The operative words here are "free medical care," which, again, we hold is applicable to plaintiffs who receive Medicaid, not plaintiffs who receive Medicare or private insurance benefits.

CONCLUSION
In conclusion, Medicaid recipients are unable to collect the Medicaid "write-off" amounts as damages because no consideration is provided for the benefit. Thus, plaintiff's recovery is limited to what *706 was paid by Medicaid. However, in those instances, where plaintiff's patrimony has been diminished in some way in order to obtain the collateral source benefits, then plaintiff is entitled to the benefit of the bargain, and may recover the full value of his medical services, including the "write-off" amount.
VICTORY, J., concurs in the result.
KNOLL, J., additionally concurs and assigns reasons.
KNOLL, Justice, Additionally Concurring.
I additionally concur with the majority opinion to emphasize the narrowness of our holding.
Under the collateral source rule, a tortfeasor may not benefit, and an injured plaintiff's tort recovery may not be reduced, because of monies received by the plaintiff from sources independent of the tortfeasor's procuration or contribution. Louisiana Dep't of Transp. and Dev. v. Kansas City S. Ry. Co., 02-2349, p. 6 (La.5/20/03), 846 So.2d 734, 739. This holding is not disturbed by today's ruling. There are many and varied origins of collateral sources which may provide compensation for the tort victim's injuries. In addition to Medicare, Medicaid and insurance benefits, collateral sources can also comprise payment of wages unless for services performed, worker's compensation, unemployment compensation, sick pay and related employee benefit programs, Social Security, pension and retirement funds, and benefits provided gratuitously by private parties or government agencies under compulsion of neither contract nor statute. 3 Damages in Tort Actions § 17.00 (1997). Often an injured person receives gratuitous medical, economic or other assistance from governmental agencies or private benefactors. Id., § 17.41.
Write-offs, as in this case before us however, are technically not payments from a collateral source. Dyet v. McKinley, 139 Idaho 526, 81 P.3d 1236, 1239 (2003). Therefore, we correctly find the plaintiff is not entitled to recover these amounts from the defendant, where the write-offs are mandated by the Medicaid program.
The majority opinion is strictly limited to the amounts written off by the health care providers in accordance with the Medicaid program. Our holding today does not include a tort victim who is the beneficiary of largesse from a private benefactor, where there is no consideration provided for that benefit and the plaintiff's patrimony was not diminished; under these circumstances the collateral source rule is applicable and the tort victim is still entitled to recover damages otherwise recoverable from the wrongdoer. Simply stated, gratuitous collateral sources are not excluded from the collateral source rule under our holding. Our holding here is limited to the amounts written off by the health care provider, where no consideration was provided for that benefit, as contrasted with Medicare and private insurance, where consideration is provided for the benefit.
NOTES
[1] On May 11, 1994, Virgie Tipton, Tommy Bozeman's mother, filed a separate, Concursus Petition on his behalf alleging that she had been appointed as Tommy Bozeman's provisional curatrix. The two separate suits were never consolidated, although the trial court had scheduled, but subsequently continued, a Motion to Consolidate. Nonetheless, an apparent settlement with Chrysler Corporation occurred, as briefly discussed in Bozeman v. State of Louisiana, DOTD, 34,430 (La.App. 2 Cir.4/4/01), 787 So.2d 357, 368. The Concursus proceedings are not a part of the instant suit before the court. However, it should be noted that the Louisiana Department of Health and Hospitals (DHH) filed an Answer to the Petition for Concursus asking for judgment in DHH's favor for $310,749.46.
[2] LSA-R.S. 46:437.12. provides:

A. In addition to the requirements specified in R.S. 46:437.11, the provider agreement developed by the department shall require the health care provider to comply with the following:
(10)(a) Accept payment from the medical assistance programs as payment in full, and prohibit the health care provider from billing or collecting any additional amount from the recipient or the recipient's responsible party, except, and only to the extent that the department permits or requires, a copayment, coinsurance, or a deductible to be paid by the recipient for the goods, services, or supplies provided.
[3] Federal law requires each state participating in the Medicaid program to designate a single agency to administer the program. 42 C.F.R. 431.10. Among the agency's duties, is a requirement to make efforts to recover Medicaid funds that were paid in connection with a recipient's tort action from liable third parties. 42 C.F.R. 433.138. In Louisiana, that agency is the Department of Health and Hospitals (DHH) and LSA-R.S. 46:446 is the statute that empowers DHH to recover such funds. LSA-R.S. 46:446(B) states that a plaintiff who files suit for injuries and receives Medicaid benefits for those injuries "shall at the time suit is filed cause a copy of the petition to be served" on DHH. Also, "(s)uch person filing suit shall be responsible to the department to the extent of the medical payments or assistance received, interest, and attorney fees if he fails to have service made upon the department."

In Bozeman II, the court concluded that DHH could not recover because the agency had knowledge of the suit. Nothing in this record indicates that DHH was ever served with a copy of the plaintiff's petition. Bozeman II, at 969. Although DHH had knowledge of the suit, knowledge alone is insufficient. Actual knowledge of a legal action cannot satisfy the want of citation and service of process because proper citation and service are the foundation of all actions. Naquin v. Titan Indemnity Co., et al., XXXX-XXXX (La.2/21/01), 779 So.2d 704. Thus, both the Bozeman II and Cole courts erred in denying DHH its ability to recover funds. Their rulings incorrectly focused on DHH's failure to intervene rather than defendant's failure to meet the mandatory service requirements. Recently-passed legislation, Senate Bill No. 968, Act No. 1208 of the Regular Session, 2003, validates the position that the Legislature intended for DHH to be able to recover said funds, despite its failure to intervene at the trial court level. The statute reads as follows:
H. The Department of Health and Hospitals shall not lose its rights to recover the assistance payments of medical expenses the department has paid or is obligated to pay on behalf of an injured, ill, or deceased person in connection with said injury, illness, or death if the department does not intervene or file its own cause of action or take any other action allowed pursuant to the assignment of rights provision of Subsection E of this section, or R.S. 46:446.
[4] Deborah Van Meter, Louisiana's Collateral Source Rule: Time For A Change?, 32 LOY. L.REV. 978, 989. "The Louisiana courts have unanimously embraced the collateral source rule and have applied the doctrine in most instances. The seminal case of Gunter v. Lord, 242 La. 943, 140 So.2d 11 (1962), expresses the Louisiana Supreme Court's acceptance of the collateral source rule."

Also, Kansas City Southern Ry., 846 So.2d 734, 739 (2003). "The collateral source rule is of common law origin, Restatement (Second) of Torts section 920A (1979), yet wellestablished in the jurisprudence of this state."
[5] Deborah Van Meter, supra note 1, at 978.
[6] Id. at 1003.
[7] Moceri and Messina, The Collateral Source Rule in Personal Injury Litigation, 7 GONZ. L.REV. 310, 312 (1972).