# STATE OF LOUISIANA
## COURT OF APPEAL, THIRD CIRCUIT

## 06-958

**EUGENE BELLARD**

**VERSUS**

**AMERICAN CENTRAL INS. CO., ET AL.**

**********

APPEAL FROM THE
FOURTEENTH JUDICIAL DISTRICT COURT
PARISH OF CALCASIEU, NO. 2002-6060
HONORABLE DAVID A. RITCHIE, DISTRICT JUDGE

**********

**Elizabeth A. Pickett**
**Judge**
**********

Court composed of Ulysses Gene Thibodeaux, Chief Judge, Sylvia R. Cooks, Oswald A. Decuir, Marc T. Amy, and Elizabeth A. Pickett, Judges.

**AFFIRMED IN PART; REVERSED IN PART; AND RENDERED.**

Thibodeaux, C. J.,dissents in part and assigns written reasons.

**Frederick L. Cappel**
**Raggio, Cappel, Chozen & Berniard**
**1011 Lakeshore Drive - Suite 500**
**Lake Charles, LA 70601**
**Counsel For Secondary Defendant/Appellant:**
    **Trinity Universal Insurance Co. of Kansas, Inc.**

**Gregory Paul Allen Marceaux**
**Marceaux Law Firm, L.L.C.**
**1800 Ryan Street - Suite 101**
**Lake Charles, LA 70601**
**Counsel For Plaintiff/Appellant:**
    **Eugene Bellard**

**Travis Louis Bourgeois**
**Degan, Blanchard & Nash**
**400 Poydras Street - Suite 2600**
**New Orleans, LA 70130**
**Counsel For Secondary Defendant/Appellant:**
**Trinity Universal Insurance Co. of Kansas, Inc.**

**Pickett, Judge.**

The plaintiff/appellant, Eugene Bellard (Bellard), sustained personal injuries in an on-the-job traffic accident, when he was rear-ended by an underinsured motorist, Katie Gayle (Gayle). After settling with Gayle and her liability insurer, American Central Insurance Company, Bellard proceed to trial where he sought damages from his employer's uninsured motorist (UM) carrier, Trinity Universal Insurance Company of Kansas, Inc. (Trinity). On appeal, Bellard seeks a reversal of the trial court's grant of Trinity's motion for summary judgment, which provided Trinity with a credit for the workers' compensation medical benefits that had been paid by Bellard's employer on his behalf. Bellard also seeks a increase in the trial court's awards for general damages and loss of future earning capacity, arguing that the trial court committed legal error in setting those awards because it improperly disregarded uncontested, expert witness testimony regarding the causation of his injuries and his resulting disability. Trinity, likewise, seeks a reversal of the loss of earning capacity award. It asserts an entitlement to the reduction of that award based on its claim that the trial court erred in failing to grant it a credit in the amount of the indemnity disability benefits already paid to Bellard by his employer's workers' compensation insurer.

We conclude that the UM insurer, Trinity, is not entitled to a credit for medical costs paid by the workers' compensation insurer, nor is Trinity entitled to a credit for the indemnity disability benefits paid by the workers' compensation insurer, since these insurers are not solidary obligors, and the collateral source doctrine prohibits Trinity from receiving a credit for these payments. Further, as to the issues of causation and injuries, we find no legal error as we, as did the trial court, find that there was evidence contesting the causation of his injuries and his resulting disability.

We affirm the awards of general damages and loss of future earning capacity. We also affirm the award of medical costs in the amount of $334,040.60.

## ISSUES

1. Is an uninsured motorist carrier entitled to a credit for medical and disability wage benefits paid to, or on behalf of, an injured worker by a workers' compensation carrier?

2. Did the trial court improperly disregard uncontested, expert medical testimony when determining the cause of the plaintiff's injuries and his subsequent disability status?

3. Did the trial court abuse its discretion in setting the general damage and future loss of earning capacity awards?

## FACTS

On August 26, 2002, Bellard was rear-ended by Katie Gayle. He was also involved in two subsequent accidents—one on November 24, 2002, and the other in November or December 2003. At the time of the accident at issue, Bellard was a delivery driver for a building materials retailer, Builders Sav-Mor, Inc. (Sav-Mor), and was on-duty and driving his employer's Ford F-250 pickup truck. Bellard was stopped, yielding to oncoming traffic and, upon beginning a left-turn, was struck as Gayle's car hydroplaned into the rear of the truck. Gayle estimated that she was driving at a rate of speed between twenty and twenty-five miles per hour, and Bellard estimated that his rate of speed was approximately ten or fifteen miles per hour at the time of impact.

Gayle's car struck the "Tommygate" (a brand name of a heavy-duty-steel mechanized tailgate that can be lowered and raised for loading and unloading cargo) on the rear of the truck and came to rest under the tailgate. According to Gayle, the

lift gate fell onto the hood of her car, her front and passenger side windows shattered, and her air bag deployed. Her car was not driveable and was towed from the scene; it was ultimately rendered a total loss. The truck driven by Bellard was never incapacitated by the accident, suffered almost imperceptible damage to the lift gate, and has remained in use by Sav-Mor without the necessity of any repairs.

Gayle suffered minor injuries as a result of the accident—bruising on her knees and bruises caused by her seat belt and air bag. Bellard refused medical treatment twice on the day of the accident— at the scene and upon return to his work site. He continued working that day and for approximately two weeks thereafter until September 3, 2002, when he sought treatment for generalized pain in his body at a local emergency room. He later testified that he had begun to experience pain even earlier—about five days after the accident. Over the next three years, Bellard received physical therapy, chiropractic, and orthopedic treatment for the injuries allegedly sustained in the August accident.

After a course of conservative treatment over the year and a half following the crash, Bellard underwent the first of a series of four surgeries to repair lumbar and cervical spine injuries and bilateral carpal tunnel syndrome. Specifically, in March, 2004, he underwent lumbar spine surgery, which included a facetectomy, diskectomy, and fusion at L5-S1. In early 2005, he underwent bilateral carpal tunnel surgeries, and later that year underwent cervical spine surgery, consisting of a three-level diskectomy and fusion at C3-C4, C4-C5, and C5-C6. The lumbar surgery and carpal tunnel release surgeries were deemed successful. As of the commencement of trial, Bellard remained under the care of his treating orthopedist and surgeon, Dr. Dale Bernauer, as he was still recovering from the September 2005, cervical spine surgery.

3

Bellard's pre-accident medical condition was an issue at trial, as was the fact that he was involved in two additional accidents after the August 2002, rear-end collision. Regarding his pre-existing medical condition, the record shows that he had been diagnosed in 1998 with a small disc bulge at L5-S1, and that he had received successful, conservative treatment for lower back pain caused by that condition until 1999. It is likewise undisputed that Bellard sought treatment for low back pain prior to the August accident at W. O. Moss Regional Hospital in October 2000, January 2001, and January 2002. However, Bellard testified that he sought those treatments for what he believed was an apparent strained muscle that had been causing him pain intermittently.

Notwithstanding these indications of a pre-existing lumbar spine injury, his medical history conversely showed that upon being hired by Sav-Mor in February 2002, he underwent a physical examination which included a neurological examination and an examination of the neck, all resulting in normal findings. Also, his employer's representative testified at trial that during Bellard's ten-month tenure there, as a warehouse delivery driver, he was able to perform the physically demanding job without any apparent difficulty. This job regularly included loading and unloading building materials and performing various manual labor duties. Dr. Dale Bernauer, who was aware of this pre-existing medical and work history, opined that the ruptured disc in Bellard's lower back, which he determined was larger than it had been in 1998, was likely caused and/or aggravated by the August 26, 2002, accident.

Regarding the two automobile accidents that occurred later, the record reflects that almost three months after Bellard was rear-ended by Gayle, on November 24,

4

2002, he drove his car into a telephone poll in a self-described suicide attempt. He testified that the car was a total loss and that the impact was "very hard" and "whipped" him forward and back. Bellard stated that he did not seek medical treatment for physical injuries immediately after the November accident. Rather, on November 26, 2002, a few days later, he sought treatment for depression and was admitted for one week for psychiatric treatment at Lake Charles Memorial Hospital. Bellard testified that he was depressed due to debt, unemployment, and chronic pain, which he attributed to the car accident with Gayle. After that accident, Bellard's medical records from his treating orthopedist, Dr. Bernauer, note that Bellard reported an increase in his pain, but that he claimed no new injuries.

The third accident occurred about a year later, in late November or early December, 2003, when Bellard, traveling at a speed of about thirty-five miles per hour, ran a stop sign and broad-sided another car. He testified at trial that the impact was also "hard" and that the front end of his Ford Ranger suffered extensive damage, rendering it a total loss. Again, he denied suffering any injuries in that accident. Although both accidents occurred prior to Bellard's surgeries, Dr. Bernauer testified that, in his opinion, all of Bellard's injuries were caused by the first accident with Gayle and not the subsequent accidents. The trial court questioned that conclusion.

It was established at trial that Dr. Bernauer's preliminary diagnoses of the herniated lumbar disc, carpal tunnel syndrome, and a neck injury were all made at his first evaluation of Bellard, which took place on September 25, 2002. However, the diagnostic tests, an MRI and EMG, which confirmed these conditions, were not taken until February 2003, after the second accident had occurred. Despite the additional accidents, Dr. Bernauer testified that Bellard's symptoms and complaints had not

5

changed since the first accident, leaving him with the opinion that the first accident likely caused the injuries and/or aggravated pre-existing ones.

Bellard has not worked since September 2002, with the approval of his physician. At the time of trial, he had not yet been released to return to work. Dr. Bernauer, at the time of his deposition on February 13, 2006, had reached the conclusion that Bellard was functionally disabled, explaining that Bellard was susceptible to adjustment segment syndrome, a condition affecting twenty-five percent of persons with lumbar and/or cervical fusions. He testified that the condition causes additional pressure to be placed on the discs above and below those that have been fused, which could cause further injury and the need for corrective surgery. He believed that Bellard was particularly susceptible because of the multiple fusions he had undergone and that the syndrome would be less likely to occur if Bellard did not return to work. Dr. Bernauer opined that, ultimately, he did not anticipate Bellard being able to return to the workforce in his prior capacity, but stated that another functional capacity examination (FCE) could be done in approximately three months to gauge his ability to return to work in some capacity. He also testified that he believed Bellard would need medical care for another three years.

The only FCE which had been performed on Bellard, on June 22, 2004, was done approximately two years prior to trial. Only the lumbar surgery had been performed at that time. The report, issued by vocational rehabilitation specialist, Dr. John Grimes, concluded that Bellard was temporarily, totally disabled based on the light duty limitations that had been placed on him by Dr. Bernauer. At that time, Dr. Grimes believed that, depending on Bellard's future medical treatment and residual functional capacity, he had an excellent potential for returning to the workforce if

retrained. This was because he found that Bellard possessed average intellectual capacity and exhibited "impressive academic skills," considering that he only had a formal ninth grade education. Dr. Grimes believed that Bellard possessed satisfactory skills that would enable him to achieve a GED within a few months and complete additional technical/associate level training, all of which would reduce his loss of access to the workforce, a history of which consisted primarily of manual labor type jobs. Dr. Grimes opined that this retraining could be accomplished during an eighteen to twenty-one month period. The record reflects that this report was admitted at trial as evidence of Bellard's disability status. There was no updated vocational rehabilitation report presented at trial after the subsequent bilateral carpal tunnel and cervical surgeries were performed. However, the record reflects that the plaintiff had a full recovery from both surgeries and was experiencing no adverse symptoms.

The bench trial of this matter occurred on February 22-23, 2006. Prior to trial, Bellard settled with the negligent driver, Gayle, and her insurer, for her liability policy limit of $50,000.00, and voluntarily dismissed them from the action. He then proceeded to trial against Trinity for UM benefits. As of the date of trial, Bellard, who had been employed at a rate of $6.50 per hour at the time of the accident, had received workers' compensation medical benefits in the amount of $334,040.60, and workers' compensation disability benefits, totaling of $37,991.00, at a weekly rate of $273.14.

Prior to the commencement of the trial, the court, in a nine-page ruling, granted a motion for summary judgment that had been filed by Trinity, which sought a credit for all workers' compensation medical benefits that Bellard had received. The trial

7

court found that Trinity was entitled to the credit because it was solidarily liable with the workers' compensation insurer for Bellard's injuries. Also, the court concluded that Bellard could not be compensated twice for the same category of damages under Louisiana law. The ruling was silent as to whether a credit would also be granted for the workers' compensation disability benefits that had already been paid to Bellard. Consequently, Trinity's request on this issue was rejected.

In March 2006, after having taken the matter under advisement, the court rendered its ruling on damages. The court stated that its decision was influenced by the testimony of Gayle's mother, Rhonda Allison (a police officer who was off-duty at the time of the accident, but responded anyway), during which she stated that at the scene of the accident Bellard told her that he did not even realize that he had been hit until he looked in his rearview mirror and saw smoke coming from Gayle's car. Also, the court focused on evidence of the minor damage suffered by the truck being driven by Bellard at the time, recalling that the evidence showed that the truck was driven from the scene and that no repairs to the truck had even been deemed necessary by Bellard's employer after the accident. The court further noted the delay of approximately one week before Bellard sought medical treatment, as well as the occurrence of two additional accidents after the rear-end collision, both of which were, by the plaintiff's own testimony, significantly more severe than the accident at issue.

Clearly, the trial judge was torn between, and grappled with, seemingly irreconcilable emotions on the question of causation. On the one hand, he expressed suspicions over Bellard's alleged lack of injury in the two subsequent accidents. Yet, he was faced with the testimony of the treating physician whose testimony was

buttressed by that of an independently-appointed physician. As explained by the trial judge:

> Mr. Bellard claims that all the injuries he sustained were a result of that first accident on August 26th, 2002. And this is kind of where it gets hard for me because I have a doctor -- I have Dr. Bernauer who apparently was aware of the subsequent accidents, or at least that first subsequent accident, where he testified that based on the complaints that he received prior to the second accident that -- and based on his professional opinion, the type of injuries that were sustained, that those injuries and the resulting surgeries were caused by the first accident on August 26th, 2002.

> Although I believe Mr. Bellard testified that on November 24th, 2002, or as a result of that November 24th, 2002 accident he did sustain -- well, he says he didn't get hurt any worse in that accident or the other accident, which I do find suspicious. I think he said he did have some increased pain as a result of that but that it subsided and went back to -- at some point to pre-accident, pre-November 24th accident problems and that -- and I do find some problems with that as far as the -- because if we had an eggshell -- you know, the proverbial egg eggshell skull person, you know, we find the plaintiff -- or we take the plaintiff as we find them, you know, if he was that fragile to where he sustained those kind of injuries on August the 26th, 2002, and presumably the same fragile person would have sustained some additional injuries or some worse injuries on November 24th, 2002 and December -- November or December of 2003, because those accidents -- the impact seemed to be somewhat -- I've seen in the evidence that those latter two accidents were worse as far as the impact than the first one, but I still struggle with the fact that I have a doctor that -- that is indicating that he believes those matters are a result -- and actually we have two doctors. Dr. Bernauer, the treating physician, testified that those -- you know, that the -- the injuries and the surgery were a result of the first accident and that -- and we also have Dr. Foret, who although I believe Dr. Foret may not have had all the information available to him, he did testify that the carpal tunnel can be caused by trauma, which I believe the defense expert, Dr. Bernard, said it could not be. So, I mean, I think at least we have a somewhat independent doctor saying that it could be. But then the question is: Was it from the first accident or the second or the third?

> So, and I don't know if I'm laying all this stuff out as to why I've struggled with this as much as I have, but that's -- I do see some problems and -- with everything that I have seen, but I've got to -- but I've got to -- I mean, I'm certainly not an expert, but I still have problems believing that Mr. Bellard is totally disabled as a result of everything that's happened. It's hard for me to accept that.

The court then awarded Bellard $62,422.00 for his pre-trial loss of earning capacity and $29,822.00 for loss of future earning capacity, which constitutes a total loss of earning capacity award of $92,244.00. The loss of future earning capacity award assumes that Bellard will be retrained and back in the workforce twenty months post-trial. These figures represent the amounts calculated by the defense's expert economist, Dr. R. Douglas Womack, who took into account the findings stated in the functional capacity evaluation report issued by Dr. Grimes some two years earlier.

The trial court also awarded $50,000.00 in general damages, stating that this amount took into consideration Bellard's out-of-court settlement with Gayle and her insurer for $50,000.00. The court awarded medical costs to Bellard but also awarded a corresponding credit for the total medical costs accrued, in the amount of $334,040.60, to Trinity. Accordingly, the trial court's total award to Bellard was $142,244.00.

## LAW AND DISCUSSION

**UM Insurer Entitlement to Credit for Workers' Compensation Benefits Paid**

Bellard contends that the motion for summary judgment, which granted to Trinity a credit for all workers' compensation medical benefits paid on Bellard's behalf, should be reversed. He argues that the ruling was incorrect because the workers' compensation insurer and the UM insurer, Trinity, are not solidary obligors—meaning each has a separate obligation to him under the facts of this case. Moreover, he contends that the collateral source rule classically operates in this case to prohibit Trinity from receiving a credit. On the other hand, Trinity, relying on La.Civ.Code art. 1794, argues that it is a solidary obligor with the workers'

compensation insurer under the facts of this case. Consequently, when one obligor satisfies the mutual obligation, the obligee (Bellard) is not entitled to seek payment of that obligation from the other solidary party. Consequently, Trinity asserts that all payments issued by the workers' compensation carrier for medical benefits to treat Bellard's injuries and indemnity benefits paid to Bellard for his lost earning capacity prior to trial, are resolved obligations that Bellard is prevented from again seeking recoupment.

Appellate courts undertake de novo reviews of summary judgments, applying the same criteria governing the trial court's consideration of the motion. *Schroeder v. Bd. of Sup'rs of La. State Univ.*, 591 So.2d 342 (La.1991). This means that where the "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to material fact, and that mover is entitled to judgment as a matter of law," then summary judgment is appropriate. La.Code Civ.P. art. 966(B). Moreover, a de novo review is appropriate because this issue represents a question of law.

The issue of whether a UM insurer is entitled to a credit for workers' compensation benefits paid to an injured worker hinges on whether the insurers meet the definition of solidary obligors and whether or not the collateral source rule applies. This analytical framework flows from Civil Code article 1794 which states that "[a]n obligation is solidary for obligors when each obligor is liable for the whole performance[,] and that "[a] performance rendered by one of the solidary obligors relieves the others of liability toward the obligee." On the other hand, the jurisprudentially-created collateral source rule states that "a tortfeasor may not benefit, and an injured plaintiff's tort recovery may not be reduced, because of

11

monies received by the plaintiff from sources independent of the tortfeasor's procuration or contribution." *Bozeman v. State*, 03-1016, p. 9 (La. 7/2/04), 879 So.2d 692, 698. The collateral source rule operates to ensure that the injured plaintiff's award from the tortfeasor is not reduced by payments received from independent sources. *Id*. The goal is to prohibit the tortfeasor from benefitting from the plaintiff's entitlement to other benefits under the circumstances. *Bozeman*, 879 So.2d 692.

The issue of whether an employer's UM insurer and workers' compensation insurer are solidary obligors was squarely addressed by this court in *Leger v. Sonnier Exterminating Co.*, 05-1291, (La.App. 3 Cir. 4/5/06), 926 So.2d 158, *writ denied*, 06-1033 (La. 6/23/06), 930 So.2d 982, wherein the court stated:

> Sonnier [,the plaintiff's employer,] asserts that the jurisprudential definition of solidarity does not apply to Sonnier and [the plaintiff's] UM insurer, State Farm. We agree. Sonnier and State Farm have different obligations to Leger. Sonnier's obligation is to provide workers' compensation benefits; State Farm's obligation under the policy is to provide UM insurance. As stated in *Viada v. A & A Machine Works, Inc.*, 05-210, p. 6 (La.App. 4 Cir. 6/15/05), 914 So.2d 1113, 1117:
>
>> The claim plaintiff has against each entity--his workers' compensation claim against his employer and its insurer, on one hand, and against the UM insurer of his employer's vehicle sounding in tort, on the other hand--arise from separate parts of Louisiana law. [Plaintiff's] claims are [against] different entities. The elements of damage to be compensated by the two insurers are not identical. For example, the UM insurer can compensate for pain and suffering, mental anguish, loss of consortium, and other items of special and general damage, that are specifically excluded from the scope of compensation under workers' compensation jurisprudence.
>>
>> Thus, the employer's workers' compensation carrier and UM carrier are not solidary obligors. Each is not bound for the whole. The damages for which the UM carrier may be held here are different from those for which a workers' compensation carrier can be held.

12

*Leger*, 926 So.2d at 162. Accordingly, we find that the trial court erred in determining that the employers' UM insurer, Trinity, and the employer's workers' compensation insurer are solidarily liable for Bellard's medical expenses. They are not solidary obligors. We do find, however, that the UM insurer, Trinity, is a solidary obligor with the dismissed tortfeasor. *See Hoefly v. Government Employees Insurance Co.*, 418 So.2d 575 (La.1982).

Accordingly, we find that the collateral source rule is applicable. Again, the rule states that, "a tortfeasor may not benefit, and an injured plaintiff's tort recovery may not be reduced, because of monies received by the plaintiff from sources independent of the tortfeasor's procuration or contribution." *Bozeman*, 879 So.2d at 698. An injured worker receiving workers' compensation benefits is not excluded from receiving the protection of the collateral source rule because, as we stated in *Melancon v. Lafayette Insurance Co.*, 05-762 (La.App. 3 Cir. 3/29/06), 926 So.2d 693, *writs denied*, 06-974 (La. 6/16/06), 929 So.2d 1291, 06-1293 (La. 6/16/06), 929 So.2d 1293, an injured worker has, in fact, given consideration for the workers' compensation benefits received, by waiving the right to sue his employer for damages when injured on the job. In exchange for providing those workers' compensation benefits, the employer, in turn, receives a limit on his financial liability for any applicable injuries. *Id*.

Consequently, due to Bellard's contribution to his receipt of these workers' compensation benefits, the damages awarded cannot be considered as an illegal double recovery of damages, a concern raised by Trinity. This is because there can be no double recovery when an "injured party's patrimony was diminished to the extent that he was forced to recover against outside sources and the diminution of

13

patrimony was *additional* damage suffered by him." *Bozeman,* 879 So.2d at 699. (Emphasis in original).

Therefore, the judgment granting the motion for summary judgment is reversed. Trinity must pay medical expenses in the amount of $334,040.60, as ordered by the trial court, without the benefit of a credit for workers' compensation benefits paid in this amount. Applying the same reasoning, we also find that Trinity is not entitled to a credit for the wage indemnity benefits paid, to date, to Bellard in the amount of $37,991.00.

**Causation and Damages**

Bellard also claims that the general damage award and loss of future earning capacity award should be reversed because they contradict the evidence presented at trial. Although Bellard acknowledges that the trial court found that the August 26, 2002, accident was a cause of his injuries, Bellard *speculates* that the trial court committed legal error by relying on "force of impact" evidence to determine his damages. As the supreme court wisely noted in *Coco v. Winston Industries, Inc.*, 341 So.2d 332 (La.1976), "it is impossible for an appellate court to judge what evidence in a particular case was given special weight by the finder of fact." True to that notion, we cannot find sufficient evidence in the record to support the contention that the trial court erroneously relied upon the force of the August collision, or the force of the subsequent accidents, to inappropriately determine damages. Rather, the trial court recited a list of factors that influenced the decision. Although the trial court mentioned the force of the impacts of the multiple collisions, this was just one of his "problems" with the notion that the first accident caused all of the plaintiff's injuries, and the others did not, as testified to by Dr. Bernauer and Bellard. The court also

took into consideration the testimony of Ms. Becky Becnel, the comptroller at Sav-Mor, who testified that on the day of the accident, when the plaintiff returned to work and reported the accident, she asked him "over and over" if he was hurt, and the plaintiff "told me no."

Additionally, the records of the plaintiff's first visit to Dr. Bernauer, on September 25, 2002 reflect that x-rays of his neck, thoracic spine, and lumbar spine were all normal. Although Dr. Bernauer ordered an MRI and an EMG on September 25, those tests were not performed until February 2003, after the second accident, which the record established was significantly more intense than the first. Hence, the results of these tests cannot conclusively establish which accident caused the abnormalities they portray. The court, nevertheless, found that Bellard successfully carried his burden of proving the August accident was a cause of his injuries.

As referenced earlier in this opinion, Bellard suffered a cervical spine injury, resulting in three-level fusion; a lumbar spine injury, resulting in a one-level fusion; and bilateral carpal tunnel syndrome, resulting in bilateral carpal tunnel release surgeries. He also suffered emotional distress after the accident. The trial court awarded the plaintiff general damages totaling $50,000.00 and a loss of future earning capacity award of $29,822.00. In doing so, the trial court adopted the loss of earning capacity estimates provided by Trinity's expert economist, Dr. R. Douglas Womack. The loss of future earning capacity award assumes Bellard's ability to obtain a GED and receive successful retraining in a light-duty capacity job within twenty months of trial, as was proposed in the 2004 functional capacity evaluation report prepared by Dr. Grimes. As alluded to earlier, Dr. Grimes' report was issued approximately two years prior to trial and prior to Bellard undergoing the bilateral

carpal tunnel surgeries and cervical spine surgery. Also, Bellard's treating orthopedist and surgeon, Dr. Bernauer, testified that Bellard was functionally disabled due to his susceptibility to adjustment segment syndrome and recommended that Bellard not return to work. However, Dr. Douglas A. Bernard, an orthopedic surgeon who performed an independent medical examination of the plaintiff, was of the opinion that the plaintiff appeared to be healing well and that, after he healed, Mr. Bellard would have a 12% *anatomical* disability rating, but that he should be able to return to the workforce and engage in "an occupation that requires lifting on a regular basis of up to 60 pounds." Further, Dr. Bernard was of the opinion that the August 2002 accident could not have caused the plaintiff's carpal tunnel problems.

It is clear that the trial court rejected, at least, Dr. Bernauer's testimony that Bellard was functionally disabled and unable to return to the workforce, and gave more weight to the opinion of Dr. Bernard and to that of the plaintiff's own rehabilitation expert, Dr. Grimes, who opined that the plaintiff's test results had "exceeded expectations" and that the plaintiff had an "excellent potential for return to the labor force." The standard of appellate review is well settled:

> It is well settled that a court of appeal may not set aside a trial court's or a jury's finding of fact in the absence of "manifest error" or unless it is "clearly wrong," and where there is conflict in the testimony, reasonable evaluations of credibility and reasonable inferences of fact should not be disturbed upon review, even though the appellate court may feel that its own evaluations and inferences are as reasonable. The appellate review of fact is not completed by reading only so much of the record as will reveal a reasonable factual basis for the finding in the trial court, but if the trial court or jury findings are reasonable in light of the record reviewed in its entirety, the court of appeal may not reverse even though convinced that had it been sitting as the trier of fact, it would have weighed the evidence differently. Where there are two permissible views of the evidence, the factfinder's choice between them cannot be manifestly erroneous or clearly wrong. In applying the manifestly erroneous--clearly wrong standard to the findings below, appellate

courts must constantly have in mind that their initial review function is not to decide factual issues de novo.

When findings are based on determinations regarding the credibility of witnesses, the manifest error--clearly wrong standard demands great deference to the trier of fact's findings; for only the factfinder can be aware of the variations in demeanor and tone of voice that bear so heavily on the listener's understanding and belief in what is said. Where documents or objective evidence so contradict the witness's story, or the story itself is so internally inconsistent or implausible on its face, that a reasonable fact finder would not credit the witness's story, the court of appeal may well find manifest error or clear wrongness even in a finding purportedly based upon a credibility determination. But where such factors are not present, and a factfinder's finding is based on its decision to credit the testimony of one of two or more witnesses, that finding can virtually never be manifestly erroneous or clearly wrong.

*Rosell v. Esco*, 549 So.2d 840, 844-45 (La.1989)(citations and footnote omitted).

After reviewing the record as a whole, we find no manifest error on the part of the trial court in its conclusions on the issues of causation and damages.

## CONCLUSION

For the reasons stated above, the motion for summary judgment, granting Trinity a credit for medical expenses paid by Sav-Mor, Inc.'s workers' compensation insurer, is reversed. The trial court's award to the plaintiff, Eugene Bellard, of medical expenses in the amount of $334,040.60, is affirmed. We also find that the trial court did not err in determining that Trinity was not entitled to a credit for disability benefits paid by workers's compensation to the plaintiff prior to trial. Finally, we affirm the trial courts awards for general damages and for loss of future earning capacity. Costs of this appeal are assessed against Trinity.

**AFFIRMED IN PART; REVERSED IN PART; AND RENDERED**.

17

EUGENE BELLARD

VERSUS

AMERICAN CENTRAL INS. CO., ET AL.


**THIBODEAUX, Chief Judge, dissenting in part.**


The trial court was manifestly erroneous in its assessment of causation and damages. The majority compounds that error.

Bellard suffered a cervical spine injury, resulting in three-level fusion; a lumbar spine injury, resulting in a one-level fusion; and bilateral carpal tunnel syndrome, resulting in bilateral carpal tunnel release surgeries. He also suffered emotional distress after the accident. The trial court awarded the plaintiff general damages totaling $50,000.00 and a loss of future earning capacity award of $29,822.00. In doing so, the trial court adopted the loss of earning capacity estimates provided by Trinity's expert economist, Dr. Womack. The loss of future earning capacity award assumes Bellard's ability to obtain a GED and receive successful retraining in a light-duty capacity job within twenty months of trial, as was proposed in the 2004 functional capacity evaluation report prepared by Dr. Grimes. Dr. Grimes' report was issued approximately two years *prior* to trial and *prior* to Bellard undergoing the bilateral carpal tunnel surgeries and cervical spine surgery. Also, Bellard's treating orthopedist and surgeon, Dr. Bernauer, unequivocally testified that

Bellard was functionally disabled due to his susceptibility to adjustment segment syndrome and recommended that Bellard not return to work.

It is clear that the trial court rejected, at least, Dr. Bernauer's testimony that Bellard was functionally disabled and unable to return to the workforce. Dr. Bernauer's opinions in this regard were *not* refuted by any evidence presented by Trinity. The trial court committed manifest error in failing to accept this testimony. I note that although the trial court's decision to accept or reject expert testimony is not to be disturbed absent manifest error, the appellate court is not required to affirm the rejection of "uncontradicted testimony or greatly preponderant objectively-corroborated testimony where the record indicates no sound reason for its rejection and where the factual finding itself has been reached by overlooking applicable legal principles." *Mart v. Hill*, 505 So.2d 1120 (La.1987).

The trial court was manifestly erroneous in seemingly placing more weight on Dr. Bernard's testimony.

Dr. Bernard examined Mr. Bellard on *one* occasion for the purpose of litigation. He stated that his opinion of Bellard suffering a residual 15% anatomical impairment rating of the spine as a result of the lumbar injury only, was not meant to be indicative of his level of functional impairment, distinguishing it from a *functional disability rating*. This anatomical spinal impairment rating did not take into consideration the existence of a cervical spine injury as well. Also, although Dr. Bernard stated initially that if Bellard had a successful lumbar discectomy and fusion, he would place *no* physical limitations on him, he also acknowledged the possibility of segment adjust syndrome occurring because of the increase in pressure on the discs above and below the fused area.

2

Regarding the existence of carpal tunnel syndrome, Dr. Bernard initially testified that Bellard did not suffer from the syndrome, but *recanted* that statement on cross-examination, testifying that he could not say that Bellard was *not* suffering from carpal tunnel. This is because it was shown that he did *not* perform *any* diagnostic tests during his examination of Bellard that would indicate the existence of the condition and that he did *not* review the EMG and nerve conduction studies that confirmed the existence of bilateral carpal tunnel syndrome.

When he recanted his prior claim, he then stated that his only opinion regarding carpal tunnel was that it could not have occurred as a result of the August accident, which he initially deemed to be minor. His later testimony revealed that he possessed no knowledge of the severity of the impact of the August 2002 crash (which he later acknowledged was *severe* based on the approximate rate of speed Gayle may have been traveling), no knowledge of the position of Bellard's arms or hands during the accident, nor any knowledge of any injuries possibly suffered by Bellard in the nature of internal bleeding, bruising or otherwise, which may have readily indicated injury to the relevant areas.

Regarding the cervical injuries, Dr. Bernard stated during direct examination that Bellard exhibited no objective findings of any nature during his pre-cervical surgery evaluation on September 30, 2004. However, on cross-examination Dr. Bernard testified that he did *not* review Bellard's CT scan and myelogram, which are the diagnostic tools used to more accurately identify or determine the extent of spinal injuries when a physical exam and/or MRI are not clear enough. In this case, Dr. Bernard admitted that his opinion of no objective findings of cervical spine injury of any nature did *not* include a review of the findings shown on the CT scan and myelogram.

3

Dr. Foret, the court-appointed IME physician, reviewed the MRIs, CT scan, and myelogram of the cervical spine, and performed a physical examination of Bellard on June 8, 2005, which revealed spasms in the neck area. He agreed with the radiologist's findings of disc bulging and osteophytic formation at the 3-4 through 5-6 levels and some central canal narrowing. He also agreed with Dr. Bernauer's decision to proceed with surgery. He acknowledged that Bellard may have had arthritic or degenerative changes in the cervical spine preceding the accident, but did not discount the accident as an aggravating factor in his chronic pain development and subsequent development of disc bulging.

*Does any of this testimony represent that which may be reasonably viewed differently, such that the trial court cannot be held manifestly erroneous in its determinations based on such?* I do not think so. It is apparent to me that there was not sufficient evidence presented by the defendant to successfully discount the three injuries attributed to the first accident, the necessity for the surgeries, nor the subsequent impairment established by the plaintiff.

Consequently, I would raise the loss of future earning capacity awards to $547,994.00, representing the loss of future earning capacity determined by plaintiff's economist, Dr. Charles Bettinger, based upon Bellard's inability to return to the workforce. I would award general damages in the amount of $250,000.00, the lowest amount which could reasonably be awarded.

For the foregoing reasons, I dissent in part.