Judgment rendered October 1, 2025.
Application for rehearing may be filed
within the delay allowed by Art. 2166,
La. C.C.P.

No. 56,512-CA

COURT OF APPEAL
SECOND CIRCUIT
STATE OF LOUISIANA

* * * * *

DORIS GRAY                                             Plaintiff-Appellant

versus

JAMES STRONG, ANPAC                              Defendants-Appellees
LOUISIANA INSURANCE
COMPANY AND STATE FARM
MUTUAL AUTOMOBILE
INSURANCE COMPANY

* * * * *

Appealed from the
Fifth Judicial District Court for the
Parish of Richland, Louisiana
Trial Court No. 48870

Honorable John Clay Hamilton, Judge

* * * * *

LUKOV INJURY LAW, LLC                            Counsel for Appellant
By: Abby Roberts Lukov

LOUISIANA LAW LADY
By: Lauren Renee Pilie

MORRIS BART, LLC
By: Diana Lynn Netterville

DAVENPORT, FILES & KELLY, LLP                  Counsel for Appellees
By: Martin Shane Craighead

* * * * *

Before COX, ROBINSON, and ELLENDER, JJ.

**ELLENDER, J.**

Doris Gray ("Gray") appeals a jury verdict finding her 40% at fault in a motor vehicle accident and finding she failed to prove any injuries as a result of the accident. She also contests the district court's rulings concerning collateral source evidence and arguments of defense counsel. Finding any error committed to be harmless, we affirm the jury's verdict.

## FACTS

On March 28, 2022, Gray, age 70, and James Strong ("Strong"), age 77, were both driving north on Broadway Street, a four-lane highway in Delhi. Strong was behind Gray, who was behind a very slow-moving tractor that took up both northbound lanes. Though he was in a no-passing zone, Strong moved to pass Gray and the tractor in the inside southbound lane. As Strong was passing Gray, she began making a left-hand turn, and the front left corner of her 2015 Chrysler 200 struck the rear passenger door of Strong's 2020 Ford F-150. Gray sued Strong, his insurer, ANPAC Louisiana Insurance Company ("ANPAC"), and her UM carrier, State Farm Mutual Insurance Company ("State Farm"), alleging Strong was liable for serious injuries to her neck, back, head, body, and mind as a result of the collision; she sought past and future medicals and general damages.[1]

Prior to trial, Gray filed a motion *in limine* seeking to exclude or limit evidence presented at trial of when Gray hired her attorney, and that the attorney referred her to a healthcare provider, negotiated a discount for her medical expenses, and paid for her treatment. She contended each of these

---

[1] Gray's claims against State Farm were dismissed without prejudice by the consent of both parties prior to trial.

topics involved information that was far more prejudicial than probative. The trial court denied Gray's motion, finding no specific evidence was sought to be excluded and no basis for rendering a blanket ruling based on generalities. The trial court stated it would consider contemporaneous objections to evidence at trial. Gray sought supervisory review with this court; we denied her writ.

### Trial Evidence

The parties entered pretrial stipulations as to evidence they would introduce, with both reserving their rights to object contemporaneously to any items of evidence if appropriate. Gray also entered a standing objection to any of the defense's exhibits pertaining to her medical bills, the payment of those bills, and any attorney-negotiated discounts. Counsel for Gray did not state the grounds for her standing objection, merely that she objected to the publication of those specific exhibits to the jury. Further, the record does not indicate where the defendants were given an opportunity to respond to Gray's standing objection, nor does it appear the trial court made a ruling on any of the items supposedly covered by Gray's standing objection.

The plaintiff's exhibits included a copy of Strong's ANPAC liability policy; certified records and bills from Traxler Chiropractic, Northeast Imaging, Bayonne Injury Clinic, Advanced Surgery Center, Spine Institute, Spine Center of Excellence, Richardson Medical Center, Delhi Community Health, and Richland Parish Hospital; property damage photographs of both vehicles; and deposition testimony with exhibits for Drs. Bayonne, Nunley, and Domangue. The defendants' exhibits included a copy of the accident report; photographs of the accident scene and of both parties' vehicles following the accident; and copies of various notes made by Gray's various

2

treatment providers, health insurance claims forms, itemizations of various charges by providers, copies of invoices sent to Gray's counsel by her treatment providers, and copies of checks sent from Gray's counsel to her treatment providers. The defense exhibits also included the curriculum vitae for Dr. Domangue, as well as his deposition transcript with exhibits.

Gray called Strong on cross as her first witness. He testified that just prior to the accident, he was traveling in the inside northbound lane on Broadway Street, behind Gray and a slow-moving tractor. He acknowledged being in a no-passing zone, but because he did not want to be behind the tractor for several miles, saw no oncoming traffic in the southbound lanes, and saw no left-turn signal on Gray's car in front of him, he pulled his truck into the inside southbound lane to pass Gray and the tractor. When he realized Gray was coming into the southbound lanes as well, he initially believed she was also trying to pass the tractor, so he moved into the outside southbound lane to allow her to pass. However, Gray was attempting a left-hand turn, and the left front of her Chrysler 200 collided with the rear passenger door of Strong's Ford F-150. He described the collision as fairly minor—two vehicles that just "skinned" each other. Gray pulled into the bank parking lot near where the collision occurred. When Strong pulled in, Gray was already standing next to her car, looking shaken but not injured. Strong stated he was not injured and sought no medical treatment for anything accident-related. He then drove himself home.

Gray testified that on the day of the accident, she was going from her home to the bank to make a deposit. She was also in the inside northbound lane on Broadway Street, right behind the slow-moving tractor and, as she

approached the bank on her left, she put on her left turn signal and made sure there was no oncoming traffic before starting her turn. As she was paying attention to oncoming traffic, she did not look behind to see Strong passing, and they collided. Gray acknowledged she did not look in her side or rearview mirrors prior to executing the left turn, and she agreed the front driver's side corner of her Chrysler 200 sedan hit the rear passenger side door of Strong's Ford F-150 truck. After impact, Gray continued on to the bank, where she parked and got out of her car. When police arrived and asked if she needed medical attention, Gray said she felt all right and declined to go to the emergency room. Her Chrysler 200 sedan was drivable, though her insurance company eventually totaled it, and Gray drove herself home after making her bank deposit. She did not go to work the evening of the crash, but she did go the next afternoon. Gray said she felt fine for three or four days, but then started experiencing back and neck pain, along with headaches. Rather than going to her primary care physician, she went to Traxler Chiropractic, which her son recommended.

Gray said she did see her primary care physician for a previously scheduled visit unrelated to her accident while she was treating with Traxler, and that physician expressed no concern about her chiropractic treatment. Because of her limited improvement, Traxler referred her to Dr. Harold Bayonne ("Dr. Bayonne"), a pain management physician, who proposed treating her with a series of injections. As the injections only provided some short-lived relief, Dr. Bayonne referred her to Dr. Pierce Nunley ("Dr. Nunley"), an orthopedic surgeon, for a consult. Gray testified she and Dr. Nunley discussed surgery as an option, but they ultimately decided to continue additional injections for as long as those would help alleviate her

4

pain. At the time of trial, Gray stated she had not been released from the care of Drs. Bayonne and Nunley. Gray described a history of high blood pressure, diabetes, chronic kidney disease, arthritis in her hands and feet, and an enlarged heart; she stated none of these issues ever caused her to experience back pain.

Dr. Bayonne testified by deposition. Gray was referred to him by Traxler due to secondary pain in her lower back and in both posterior legs down to her knees; she reported her lower back pain was between a 3 and a 7 on a scale of 10. Dr. Bayonne testified her MRI was consistent with the pain she reported but also showed mostly facet hypertrophy, consistent with her age and work history. Back pain, he stated, would not be unusual for a person her age whose job involved manual labor. Dr. Bayonne opined Gray's injuries were a result of the collision with Strong, diagnosing her with lumbar spondylosis and some disc bulge. He began treating Gray with steroid injections in the L4-L5 region of her spine and, while she reported some relief, the injections did not completely resolve her pain. He next administered bilateral L5-S1 transforaminal epidural steroid injections ("ESIs"), which he said did help the radicular pain in her legs. Because Gray's back still hurt, he administered medial branch blocks, followed by radiofrequency ablations ("RFAs"). Ultimately, because of the limited success of the injections, Dr. Bayonne referred Gray to Dr. Nunley at the Spine Institute for a surgical evaluation.

Dr. Nunley also testified by deposition. He diagnosed Gray with lumbar spondylosis with radiculopathy, sacroiliac ("SI") joint pain, and lumbar strain. He opined her pain was caused by the collision with Strong, as the pain she reported to him had never been severe enough to warrant

5

medical treatment prior to the accident. Dr. Nunley stated his treatment plan for Gray involved steroid joint injections, followed by RFAs if the steroid injections did not resolve her pain. When the RFAs did not alleviate her pain, he would administer medial branch blocks. Should Gray reach a point where the injections were no longer providing any relief, Dr. Nunley opined Gray would be a good candidate for an SI joint fusion, but he did not recommend it at the time of his deposition.

Dr. Nunley acknowledged Gray did report a history of arthritis, and that she had continued working as a custodian in the year following the accident. He also stated the MRI of Gray's spine was actually a little better than he would have expected of someone of her age and work history. Dr. Nunley acknowledged he was unaware that Gray had a negative Faber's test at Dr. Bayonne's office,[2] or that she reported arthritic right hip pain to her primary care physician as early as 2019. Dr. Nunley agreed he recommended Gray receive physical therapy, but to the best of his knowledge, she did not go.

Gray was questioned extensively about her attorney's role in her treatment. Gray conceded she consulted with an attorney before initially seeking treatment with Traxler Chiropractic; the attorney was listed as her primary insurer on her paperwork at Traxler and Northeast Imaging; and the attorney paid a great deal of her medical bills because she could not afford them, including Dr. Bayonne and Dr. Nunley. Gray admitted she was on Medicare and stated she was not aware if her attorney was negotiating with various providers for prepayments. She was aware her providers often

---

[2] A Faber's test is a physical examination maneuver used to assess the function and stability of the hip and SI joint.

declined to give her injections unless the attorney paid first. Gray stated she believed the doctors required an attorney prepayment because they did not want to make the taxpayers "foot the bill" for her treatment by billing Medicare. She also said she signed an acknowledgment that she would be responsible for all of her medical bills regardless of the outcome of her lawsuit.

Concerning her ability to work, Gray testified that she was a custodian employed by Guaranty Bank of Delhi, where she had been working for 14 years. Before the accident, she was responsible for cleaning two bank locations, but since, though her hours were unchanged, she was able to clean only one. She worked between 22 and 30 hours per week at a rate of $14 per hour. Her job duties included vacuuming, dusting, cleaning bathrooms, and taking out trash.

Gray's children both testified about the impact the accident had on their mother's life. Alicia Gray, her daughter, testified Gray could no longer garden or work in the yard; she was still working because she had to, but now had pain while doing so. Robert Gray, her son, testified he saw his mother every day, took her to receive her injections when he was able, and also noticed the toll the pain took on her after the accident. Neither offered anything more specific. At one point during her cross-examination, the trial court gently admonished Gray for looking at her son for what appeared to be guidance as to some of her answers to defense counsel's questions, and asked her to refrain from making eye contact with her son.

The defense played the deposition testimony of its own medical expert, Dr. Chad Domangue ("Dr. Domangue"), an interventional neurologist and pain management specialist. Dr. Domangue reviewed

Gray's medical records from 2016 onward; they indicated she had a fairly high BMI; had reported bilateral shoulder pain in 2017 and 2021, pain in her hands and in her right hip in 2019, on-and-off swelling in her legs; and reported what he described as "diffuse orthopedic complaints" commonly associated with aging and age-related arthritis.

Dr. Domangue found Gray's records from Traxler Chiropractic concerning. These records reflected Gray presented with muscle spasms throughout her entire spine, which are commonly associated with cerebral palsy and multiple sclerosis. According to Dr. Domangue, if Gray had presented to Traxler with such a high level of trauma to her spine, her condition would have required immediate medical evaluation; addressing those symptoms through chiropractic care would have been out of the question. Dr. Domangue also noted a lack of vitals taken and reported, no consistent pain scale ratings, and no quantifiable determination as to Gray's range of motion, which made it difficult to measure any improvement.

Dr. Domangue then focused on the treatment provided by Drs. Bayonne and Nunley, finding that nothing in their records of Gray's complaints supported the injections they performed as medically necessary. Those records included a completely normal neurological examination, several negative Faber's tests administered by Dr. Bayonne, and what Dr. Domangue deemed to be a normal MRI for someone of Gray's age and work history. Dr. Domangue viewed the MRI as showing Gray's neural foramen was patent, meaning there was no impingement of any neurological structure at any level of her spine. Regarding the ESIs administered by Dr. Bayonne, Dr. Domangue testified (over objection) that if Dr. Bayonne had submitted these to Medicare for approval, they would have been denied as not meeting

8

Medicare's medical guidelines, which are based on current medical literature.

Dr. Domangue also reviewed an X-ray of Gray's spine taken in April 2023, which he said revealed a mass the size of a baseball sitting right on top of her sacrum and next to her SI joint and the lumbar facet joints. Dr. Domangue stated each of these areas was a target of the minimally successful treatment administered by Gray's various physicians; the complaints about pain in Gray's sacral region did not begin until about 10 months after the accident; and the mass could have absolutely caused Gray's pain. Dr. Domangue saw no indication any of Gray's treating physicians reviewed this X-ray. Dr. Domangue also pointed out what he called chronic arthritic conditions present in someone over 70 years of age, stating there was "nothing new" present on the X-ray beyond the mass sitting on her sacrum.

During her interview and examination with him, Gray told Dr. Domangue she continued to work throughout her treatment with Drs. Bayonne and Nunley. She stated her pain was generally worse on her right side and, of all the procedures, the RFA helped her the most. She told him the steroid shots helped a couple of days, and the SI joint injections did not help at all. Gray reported she rarely took the pain medication prescribed to her.

Dr. Domangue stated his physical examination of Gray revealed she was neurologically intact, with a range of motion consistent with someone of her age, work history, arthritis, and facet pain. Based on his physical examination and view of all her records, he believed if she had any injuries as a result of the accident, at most they would have been an exacerbation of

9

the severe arthritis already present in her lumbar facet joints. He opined that any treatment received after February 2023 (about 11 months after the accident) was either medically unnecessary or related to her other age-related conditions. Dr. Domangue added he was being generous considering she had no broken bones, no herniated discs, no bruises, no ER visits, and no neurological issues. The pain in her sacral area or SI joints was not, in his opinion, in any way related to the accident, and he did not believe she had any pinched nerves or herniated discs. His conclusions were based on Gray's MRI, X-rays, negative Faber's tests administered by Dr. Bayonne, the very narrow focus of her treating physicians following the collision which caused them to overlook other issues present, the lack of physical restrictions placed on her, and her statement that the SI injections did nothing to help her.

Dr. Domangue also discussed the differences in billing practices between insurance companies and providers versus the way doctors are paid should they choose to await payment following a personal injury suit. He also mentioned some three times during his deposition that Gray previously had renal cancer. When given the opportunity to cross-examine Dr. Domangue about the cancer statements, the deposition transcript does not show plaintiff's counsel did so, and counsel did not insist Dr. Domangue be physically present at trial for additional cross-examination concerning his deposition testimony. In fact, she agreed to present his deposition in lieu of live testimony, fully aware of its contents, and made no objection to any specific portions of his testimony prior to trial.

In closing arguments, counsel for Strong stressed his belief Gray was not injured as a result of the accident, and her treatment was orchestrated by

10

her attorney, Morris Bart, who paid all her medical bills. Counsel for Gray specifically asked the jury to award $81,749.50 for past medicals.

### *Action of the Trial Court*

After deliberating for a little over one hour, the jury found Strong 60% at fault for the accident, casting Gray with the remaining 40% of the fault. The jury also found Gray was not injured as a result of the collision with Strong, and awarded no damages. This appeal followed.

## DISCUSSION

### *Standard of Review*

Gray asks this court to conduct a *de novo* review of her case, which she contends is proper because the trial court gave confusing and misleading instructions to the jury regarding her duty of care resulting in an erroneous finding of liability; allowed collateral source evidence, testimony, and innuendo to be put before the jury; and made improper evidentiary rulings which allowed the defendants to discuss whether Gray had health insurance that could have paid her medical bills. Gray also contends portions of the defense's medical testimony were so contrary to her own evidence as to interdict the factfinding process.

Ordinarily, the factual findings of a jury are subject to manifest error review. *Hall v. Bennett*, 54,995 (La. App. 2 Cir. 4/5/23), 361 So. 3d 1090. However, where a finding of fact is interdicted because of some legal error implicit in the fact finding process or when a mistake of law, such as a consequential but erroneous ruling on the exclusion or admission of evidence, forecloses any finding of fact, and the record is otherwise complete, the appellate court should, if it can, render judgment on the record. *Key v. Monroe City Sch. Bd.*, 45,096 (La. App. 2 Cir. 3/10/10), 32

11

So. 3d 1144.  With that said, *de novo* review is not appropriate in every such case.  *Hicks v. USAA Gen'l Indem. Co.*, 21-00840 (La. 3/25/22), 339 So. 3d 1106.

The finding of causation is a distinctly factual matter and subject to manifest error review.  *Hayes Fund for First United Methodist Church of Welsh, LLC v. Kerr-McGee Rocky Mountain, LLC*, 14-2592 (La. 12/8/15), 193 So. 3d 1110; *Davis v. Wheeler*, 53,233 (La. App. 2 Cir. 3/4/20), 293 So. 3d 173, *writ denied*, 20-00781 (La. 10/14/20), 302 So. 3d 1124.  Under this standard, reversal is warranted only if the appellate court finds that a reasonable factual basis does not exist for the trial court's finding and the record establishes that the finding is clearly wrong or manifestly erroneous.  *Ryan v. Zurich Amer. Ins. Co.*, 07-2312 (La. 7/1/08), 988 So. 2d 214; *Davis v. Wheeler, supra*.

On thorough review, we find nothing in this record that prevented the jury from receiving the relevant evidence, analyzing it, and assessing the competing claims.  While we do find some evidence was admitted in error, we believe the error was harmless for the reasons detailed later in this opinion, and did not interdict the factfinding process.  For those reasons, this court will apply the manifest error standard in its review.

We now turn to Gray's four assignments of error.

### *Fault for the Accident*

Gray argues because the collision with Strong would not have occurred had Strong refrained from passing her in a no-passing zone, and because the trial court gave a "confusing" jury instruction regarding Gray's duty of care as the left-turning motorist, the jury erred in assigning her 40% of the fault for the accident.  She asks we reconsider the jury's fault

12

allocation, suggesting we are bound by the decision in *Stewart v. Barnett*, (La. App. 2 Cir. 11/1/06), 942 So. 2d 211, and should assign her no more than 15% of the liability.

Louisiana applies a comparative fault system, based on the "degree or percentage of fault of all persons causing or contributing to the injury[.]" La. C.C. art. 2323(A).  In assessing comparative fault, the courts typically consider (1) whether the conduct resulted from inadvertence or involved an awareness of the danger, (2) how great a risk was created by the conduct, (3) the significance of what was being sought by the conduct, (4) the capacities of the parties, whether superior or inferior, and (5) any extenuating circumstances which might require the actor to proceed in haste, without proper thought.  *Malta v. Herbert S. Hiller Corp.*, 21-00209 (La. 10/10/21), 333 So. 3d 384; *Watson v. State Farm Fire & Cas. Ins. Co.,* 469 So. 2d 967 (La. 1985); *Criswell v. Kelley*, 54,188 (La. App. 2 Cir. 3/9/22), 335 So. 3d 483.  The trial court's allocation of fault is a factual determination, and thus subject to a manifest error review.  *Malta v. Herbert S. Hiller Corp.*, *supra*; *Duncan v. Kansas City S. Ry. Co.*, 00-0066 (La. 10/30/00), 773 So. 2d 670. The allocation of fault is not an exact science or search for one precise ratio, but rather the search for an acceptable range; an allocation by the factfinder within that range cannot be clearly wrong.  *Malta v. Herbert S. Hiller Corp.*, *supra*, and citations therein.

The appellate court neither assesses the credibility of witnesses nor reweighs evidence.  *State v. Kelly*, 15-0484 (La. 6/29/16), 195 So. 3d 449; *State v. Galloway*, 55,591 (La. App. 2 Cir. 4/10/24), 384 So. 3d 1167.  When considering matters on appeal, the reviewing court affords great deference to the jury's decision to accept or reject the testimony of a witness in whole or

13

in part. *State v. Galloway*, *supra*. Reversal of a jury's finding is warranted only when no reasonable factual basis exists in the record for that finding. *Ryan v. Zurich Am. Ins. Co.*, *supra*.

In her original brief, and in her reply, Gray relies heavily on *Stewart v. Barnett*, *supra*, to argue this court must find her no more than 15% liable for this accident. However, despite Gray's insistence that the facts in *Stewart* are "nearly identical," they are not. In *Stewart*, the motorist made a left-hand turn from a *stopped* position, where she was waiting to turn onto a four-lane highway. Several vehicles to her left stopped and waved her on to pull out, which required her to cross several lanes of traffic before turning left. As she was turning, she was hit by a motorist who came from behind to pass the motorists stopped to allow the plaintiff to make her left turn. The facts in *Stewart* are such that it seems hard to credit how the plaintiff could have seen the passing motorist when she began her left turn, while in the instant case, it does not seem unreasonable for a jury to find a person in Gray's position could have easily, and reasonably, made sure no motorists were attempting to pass the slow-moving tractor prior to attempting her turn.

Jurors heard Strong testify Gray did not use her blinker, while Gray said she did. Also, while Strong acknowledged being in a no-passing zone, he said he would not have passed Gray had she been using her blinker. The jury was free to accept the version of events it found more credible. Gray testified she was looking for oncoming traffic only, but not behind her, despite following a slow-moving tractor for a period of time. Jurors saw photographs of minor damage to Gray's front bumper and Strong's rear passenger door. As the record contains support for finding Gray was at least

14

partially at fault for the collision, we cannot find the jury's allocation of fault to be manifestly erroneous.

Turning to Gray's contention the jury instructions were so misleading as to constitute reversible error, we first note no objection was made to the instructions. In fact, after instructions were given to the jury, but before allowing the jury to recess for deliberations, the trial court asked counsel for both parties if either had any objections to the jury instructions as given. Both stated they had none.

A party may not assign as error the giving or the failure to give an instruction unless he objects thereto either before the jury retires to consider its verdict or immediately after the jury retires, stating specifically the matter to which he objects and the grounds of his objection. La. C.C.P. art. 1793(C); *Sher v. Lafayette Ins. Co.*, 07-2441 (La. 4/8/08), 988 So. 2d 186, *on reh'g in part* (7/7/08). The complaining party must specifically state on the record the complaint as to each special charge refused and the grounds for each objection; a blanket objection with no supporting reasons does not meet the requirements of La. C.C.P. art. 1793. *Sher v. Lafayette Ins. Co.*, *supra*; *Sanders v. Bain*, 31,362 (La. App. 2 Cir. 12/9/98), 722 So. 2d 386.

As no objection was made to the jury instructions, Gray failed to preserve this issue for appeal. However, even if an objection had been made, when the appellate court reviews a trial court's instructions to a jury, it is required to determine whether the trial judge adequately instructed the jury. The giving of an allegedly erroneous jury instruction will not constitute grounds for reversal unless the erroneous instruction has injured or substantially prejudiced the complaining party. Trial courts are given broad discretion in formulating jury instructions, and a trial-court judgment

15

should not be reversed so long as the charge correctly states the substance of the law. *Barber Bros. Contracting Co. v. Capitol City Prod. Co.*, 23-00788 (La. 6/28/24), 388 So. 3d 331, *on reh'g*, 23-00788 (La. 12/19/24), 397 So. 3d 404, *reh'g denied*, 23-00788 (La. 2/14/25), 400 So. 3d 918.

The jury charge informed the jury of Strong's obligations as a passing motorist, addressed Gray's obligations as a left-turning motorist, and advised the jury if it found both parties at fault for the accident, then percentages of fault must be assigned to each party. The instructions given correctly state the substance of the law.

Gray's assignment of error concerning allocation of fault in the accident is without merit.

### *Injury as a Result of the Accident*

Gray strenuously argues the jury erred in finding she was not injured as a result of her collision with Strong. She claims she adequately proved her injuries through the testimony of her medical providers and their records, and no medical testimony proved otherwise. Gray believes she established it was more likely than not those injuries were caused by the collision with Strong. She contends when the jury erred in finding she was not injured, it also erred in failing to award special and general damages.

A person injured through the fault of another is entitled to full indemnification for the damages caused. La. C.C. art. 2315; *State v. La. Land & Expl. Co.*, 12-0884 (La. 1/30/13), 110 So. 3d 1038; *Wainwright v. Fontenot*, 00-0492 (La. 10/17/00), 774 So. 2d 70. Moreover, a defendant takes his victim as he finds her and is responsible for all natural and probable consequences of his tortious conduct. *Wainwright v. Fontenot*, *supra*; *Davis v. Wheeler*, *supra*.

16

In a personal injury suit, the plaintiff bears the burden of proving the existence of the injury as well as the connection between the injury sustained and the accident that caused the injury.  *Lewis v. State*, 94-2370 (La. 4/21/95), 654 So. 2d 311.  A plaintiff proves the causal connection through medical and lay testimony that it was more probable than not the injury was caused by the accident.  *Maranto v. Goodyear Tire & Rubber Co.,* 94-2603 (La. 2/20/95), 650 So. 2d 757; *Davis v. Wheeler, supra.*

A claimant's injury is presumed to have resulted from an accident, if before the accident the injured person was in good health, but commencing with the accident the symptoms of the disabling condition appear and continuously manifest themselves afterward, providing that the medical evidence shows there to be a reasonable possibility of causal connection between the accident and the disabling condition.  *Housley v. Cerise*, 579 So. 2d 973 (La. 1991); *Davis v. Wheeler*, *supra*.[3]  If a plaintiff makes this showing, he is entitled to a presumption of causation, and the burden shifts to the defendant to prove some other particular incident could have caused the injury of which the plaintiff complains.  *Lowery v. St. Francis Med. Ctr.*, 54,513 (La. App. 2 Cir. 5/25/22), 339 So. 3d 770, *citing Goldsby v. Blocker*, 51,584 (La. App. 2 Cir. 9/27/17), 244 So. 3d 703.

Whether an accident caused a person's injuries is a question of fact, and an appellate court may not set aside a finding of fact made by a judge or jury in the absence of manifest error or unless it is completely wrong; if the

---

[3] The *Housley* presumption was overturned by Act No. 18 of the 2025 Regular Session of the Louisiana Legislature, contained in La. C.E. 306.1, shifting the burden of proof in certain personal injury cases to the plaintiff to demonstrate a clear connection between their claimed injuries and the accident that forms the basis of their suit for damages.  However, these new provisions are to be applied prospectively, with an effective date of May 28, 2025.

factfinder's conclusion was reasonable and supported by the record, the findings must stand. *Jones v. Mkt. Basket Stores, Inc.*, 22-00841 (La. 3/17/23), 359 So. 3d 452; *Lowery v. St. Francis Med. Ctr.*, *supra*. As previously stated, the appellate court neither assesses the credibility of witnesses nor reweighs evidence, and the reviewing court affords great deference to the jury's decision to accept or reject the testimony of a witness in whole or in part. *State v. Kelly*, *supra*; *State v. Galloway*, *supra*.

Dr. Domangue was the defense expert, and Gray argues his testimony was completely unsupported by any medical evidence submitted in support of her claims, including the testimony of her own treatment providers, and she claims a significant misrepresentation made by him (specifically, his stated belief that Gray previously had renal cancer) misled the jury.

If the jury considered the opinions of any of the expert physicians, it seems likely they found Dr. Domangue to be more convincing than Gray's treating physicians. However, in general, the trier of fact is not bound by expert testimony, but is to hear and weigh expert testimony in the same manner as any other evidence. Reasonable and well-founded opinion should be considered. *Kennedy v. Thomas*, 34,530 (La. App. 2 Cir. 4/4/01), 784 So. 2d 692. The weight to be given expert testimony is dependent upon the professional qualifications and experience of the expert and especially on the facts on which that expert's opinion is based. *Id*; *Chance v. Chance*, 29,591 (La. App. 2d Cir. 5/7/97), 694 So. 2d 613; *Goodwin v. Goodwin*, 618 So. 2d 579 (La. App. 2 Cir. 1993). If the jury did find Dr. Domangue more credible than Gray's experts, then we must give great deference to those credibility determinations.

18

Gray's treating physicians both concluded Gray's neck and back injuries were caused by the collision with Strong; Dr. Domangue presented a different perspective. Dr. Domangue opined it was *possible* some of Gray's injuries could have been caused by the collision with Strong, but he limited this possibility to those injuries treated for approximately 11 months after the accident. In his opinion, anything after February 2023 could not even possibly be attributable to the collision. Certainly, his opinion cannot be interpreted as being in complete agreement with Gray's treating physicians as to causation. In fact, the only thing all physicians agreed upon was that Gray's MRI revealed a spine in good condition considering her age and work history.

Gray focuses a great deal on Dr. Domangue's statements about her being diagnosed with renal cancer, a point he mentioned three times in deposition. However, Gray's counsel did not question Dr. Domangue about his apparent misunderstanding, despite having the opportunity to do so on cross-examination, and she agreed Dr. Domangue's testimony would be entered into evidence in lieu of his live testimony. Despite Gray's assertion to the contrary in her reply brief, Dr. Domangue's testimony was not covered by the standing objection given by plaintiff's counsel, and she raised no contemporaneous objection when it was presented to the jury. Finally, in her closing, Gray's counsel emphatically disputed Dr. Domangue's findings, emphasizing Gray was not, and never had been, diagnosed with renal cancer. As the jury is free to assess the credibility and reasonableness of expert testimony, and as we do not know every reason for a jury's verdict, we cannot say Dr. Domangue's mistaken comments that Gray had renal cancer were sufficient to sway the jury.

19

It does not appear Dr. Domangue's opinion about Gray's injuries was based on anything other than his review of her medical records, his physical examination, his discussion with her, and his own medical training and experience. Certainly, his opinion does not appear to be baseless.

In addition to Dr. Domangue's testimony, there is substantial support in the record for the jury's conclusion Gray was not injured in the collision with Strong. Gray told responding officers she was not hurt, ran her planned errands, and drove herself home after the collision. Neither Gray nor Strong asked for an ambulance to be called, and photographs of the vehicles showed very minor damage, even with Gray's seven-year-old vehicle ultimately being totaled. Gray missed work the evening of the collision, then resumed her regular work schedule as a janitor, 5 nights a week on a 4-5 hour shift. Gray admitted she first sought treatment from a chiropractor several days after the collision, only after speaking to an attorney. Gray's MRI, which was taken after the collision, showed what all expert physicians agreed was a healthy spine in better condition than expected of someone of Gray's age and work history. As there is adequate support in the record for the jury's finding, we cannot say the jury erred in finding she was not injured by the accident with Strong. Because we have found the jury's determination supported by the record, we must also find the jury was correct not to award any damages.

This assignment of error is without merit.

### Introduction of Collateral Source Evidence and Arguments Concerning that Evidence

Gray contends the trial court erred in allowing evidence, testimony, and argument regarding collateral source matters, specifically attorney

payment of medical bills. Gray contends her counsel made a standing objection to all collateral source material throughout pretrial and trial proceedings, and she contends the trial court violated the collateral source rule in two ways: by allowing discussion of "insurance" to go before the jury, and by allowing discussion of who paid Gray's medical bills to go before the jury. In the alternative, she argues if this court finds no violation of the collateral source rule, then that evidence was inadmissible pursuant to La. C.E. arts. 403 and 409. She contends the admission of this evidence is unjustly prejudicial, and she argues the defense introduced those payments as evidence only to confuse and inflame the jury.

Gray further argues the trial court committed reversible error when it allowed the defense to make arguments regarding "attorney-orchestrated medical treatment" because those arguments also violated the collateral source rule. Further, even if this court finds the collateral source rule does not apply, then the arguments made by defense counsel were unfairly prejudicial and so inflammatory as to warrant reversal.

Gray details five specific categories of the evidence, testimony, and arguments she believes are prohibited by the collateral source rule set forth in La. R.S. 9:2800.27 and, therefore, the trial court improperly allowed the jury to consider, (1) Gray's consultation with an attorney prior to seeking medical treatment; (2) Gray's counsel's payment of her medical bills from Drs. Bayonne and Nunley, as well as bills from their respective surgery centers where injections were administered; (3) prepayment from her attorney was required by Drs. Bayonne and Nunley before they would administer Gray's injections; (4) testimony of Dr. Domangue claiming Medicare guidelines would not have supported or paid for certain treatment

21

Gray received, and how treating physicians can be paid when personal injury suits are pending; and (5) arguments made at closing by defense counsel characterizing Gray's medical treatment following the accident as entirely orchestrated by her attorney.

*La. R.S. 9:2800.27*

The Louisiana Supreme Court has considered the collateral source rule several times. Prior to the enactment of La. R.S. 9:2800.27, in *Bozeman v. State*, 03-1016 (La. 7/2/04), 879 So. 2d 692, the court found that from an evidentiary perspective, the collateral source rule barred the introduction of evidence that a plaintiff received benefits or payments from a collateral source independent of the tortfeasor's procuration or contribution. However, several years later, in *Hoffman v. 21st Century N. Am. Ins. Co.*, 14-2279 (La. 10/2/15), 209 So. 3d 702, the court considered attorney-negotiated discounts and payments, plainly stating:

> We adopt a bright-line rule that such attorney-negotiated discounts do not fall within the ambit of the collateral source rule because to do otherwise would invite a variety of evidentiary and ethical dilemmas for counsel.

The court in *Hoffman* found it appropriate to exclude attorney-negotiated payments from the collateral source rule because the plaintiff did not incur any additional expenses to receive the attorney-negotiated write-off, nor did he suffer any diminution in his patrimony. Notably, *Hoffman* was a judge trial, and did not address the admissibility of such evidence before a jury. Six years after the decision in *Hoffman*, the Louisiana Legislature enacted La. R.S. 9:2800.27.

At the time of this accident, La. R.S. 9:2800.27(F) provided:

> In a jury trial, only after a jury verdict is rendered may the court receive evidence related to the limitations of recoverable past

22

medical expenses provided by Subsection B or D of this Section. The jury shall be informed only of the amount billed by a medical provider for medical treatment. Whether any person, health insurance issuer, or Medicare has paid or has agreed to pay, in whole or in part, any of a claimant's medical expenses, shall not be disclosed to the jury. In trial to the court alone, the court may consider such evidence.

Gray candidly concedes the medical bills and payments at issue on appeal are ones negotiated and paid for by her attorneys, with no requirement that she pay them in order for those services to be rendered. According to the bright-line rule in *Hoffman*, *supra*, those attorney-negotiated discounts and payments are not collateral source material. However, La. R.S. 9:2800.27(F) prohibits evidence being submitted to a jury concerning the identity of any person who paid a plaintiff's medical bills. Considering *Hoffman* was a judge trial, and La. R.S. 9:2800.27 allows such evidence in a judge trial, this Supreme Court holding and the statute enacted by the legislature do not seem to contradict each other.

A discussion of the legislative history of the collateral source rule found in La. R.S. 9:2800.27 supports our conclusion the legislature did not intend for the identity of who paid medical bills to be placed before the jury, including attorney-negotiated discounts. The collateral source rule was originally codified in the Revised Statutes during the 1st Extraordinary Session of the 2020 Legislature, effective January 1, 2021; it was part of the Civil Justice Reform Act of 2020. The original bill, while it did not include what would become La. R.S. 9:2800.27, did include proposed changes to La. C.E. art. 409, which would have allowed evidence of medical payments on behalf of a plaintiff to be admissible. The reengrossed version of the bill attempted to enact La. R.S. 13:3737, which would have required the court, in any claim for medical expenses, to allow the introduction of all admissible

23

evidence, in accordance with La. C.E. art. 409; the trial court would also be required to consider that evidence in calculating damages.

The final version of the Civil Justice Reform Act of 2020 omitted the proposed changes to La. C.E. art. 409, and it did not include the proposed statute La. R.S. 13:3737. However, it did create La. R.S. 9:2800.27, which we know as the collateral source rule. It limited the recovery of medical expenses paid by Medicaid to the amounts paid, and it limited the recovery of medical expenses paid by Medicare to a point (trial courts were still directed to award 40% of the difference between the billed amount and the amount paid by Medicare to the plaintiffs). The 2020 version stated the rule did not apply to medical malpractice suits (La. R.S. 40:1231.1 et seq.), malpractice suits for state services (La. R.S. 40:1237.1 et seq.), and suits brought against the state, state agencies, or political subdivisions (La. R.S. 13:5101 et seq.).

The present version of this statute was passed during the Regular Session of the 2022 Legislature, effective August 1, 2022. While the initial bill filed sought more changes limiting recovery for plaintiffs, the final version that passed repealed only the exception for suits brought against the state, state agencies, or political subdivisions (La. R.S. 13:5101 et seq.). It appears no other substantive changes were made, and the current version of the bill contains the language previously quoted from La. R.S. 9:2800.27(F).

The version most recently passed during the Regular Session of the 2025 Legislature contains sweeping changes to the collateral source rule. Under the new provisions of La. R.S. 9:2800.27, which will go into effect on January 1, 2026, the prohibition against juries being presented with information or evidence as to what party or person is paying a plaintiff's

24

bills was removed. The stated purposes of these changes include increasing transparency in medical billing, preventing inflated claims, and contributing to the reduction of excessive insurance payouts. Additionally, in the "Editor's Notes about Prospective Application," it states: "Section 2. The provisions of this Act shall have prospective application only and shall not apply to causes of action filed prior to the effective date of this Act." Consequently, the version of La. R.S. 9:2800.27 applicable in this case is the one previously enacted.

*Admissible Evidence*

We find the trial court properly allowed testimony, evidence, and argument to be presented regarding (1) Gray's choice to consult with an attorney prior to seeking chiropractic treatment; (2) Dr. Domangue's testimony regarding Medicare and insurance billing practices in personal injury cases; and (3) statements made by defense counsel during closing arguments characterizing Gray's treatment as orchestrated by her attorneys.

Gray argues any evidence that she consulted with her attorney prior to seeking chiropractic treatment is inadmissible as it would violate the collateral source rule. There is no prohibition stated in the collateral source rule, or elsewhere, barring defense counsel from attempting to determine through questioning when a plaintiff first sought counsel following an automobile accident. While evidence as to the subject matter of any meetings between the plaintiff and her attorney would be prohibited and a violation of attorney-client privilege, asking if Gray retained counsel prior to seeking medical treatment is not prohibited.

As to Gray's contention the defense elicited prohibited testimony about insurance in the presence of the jury, presumably she is referring to

25

the testimony given by Dr. Domangue that Medicare would have deemed the transforaminal ESIs medically unnecessary and declined payment under the current guidelines, as well as his discussion of how doctors can be paid in a personal injury case. This discussion, however, did not address who was paying Gray's medical bills, and Dr. Domangue did not state Gray filed with Medicare and was denied for any of her medical care following the accident. La. R.S. 9:2800.27 does not prohibit this type of testimony; the questions asked of Dr. Domangue were not directed at who paid medical bills, but rather the necessity of medical treatment. Allowing this testimony did not violate the collateral source rule, nor was it in error.

There is also no support for Gray's claim the collateral source rule prohibited defense counsel from generally arguing her treatment was orchestrated by her attorneys. Arguments by counsel are not evidence. *Council of City of New Orleans v. Washington*, 09-1067 (La. 5/29/09), 9 So. 3d 854; *Southern v. Servpro D E Invs.*, 55,874 (La. App. 2 Cir. 8/28/24), 400 So. 3d 974, *writ denied*, 24-01190 (La. 12/11/24), 396 So. 3d 963. Additionally, after closing arguments, but prior to deliberations, the trial court stated to the jury:

> What the community expects of you and what I expect of you is the same thing you would expect if you were a party to this suit, *an impartial deliberation and conclusion based on all the evidence presented in this case and on nothing else*. (Emphasis supplied.)

The trial judge also stated to the jury:

> The evidence which you are to consider consists of the stipulated facts, the testimony of the witnesses, the documents if any that have been admitted into evidence and any fair inferences and reasonable conclusions which you can draw from the evidence submitted to you. *Neither the written pleadings nor arguments made by the lawyers nor any comment or ruling which I have made is evidence*.

26

The jury was instructed to consider only the evidence presented, and jurors were explicitly told not to consider the arguments of counsel as evidence. The jury instructions given negated the potential adverse effect defense counsel's argument may have had. *Van Buren v. Minor*, 51,960 (La. App. 2 Cir. 4/11/18), 247 So. 3d 1040, *writ denied*, 18-0768 (La. 9/21/18), 252 So. 3d 911. As will be discussed below, defense counsel should not have been allowed to argue Gray's attorneys paid for her medical bills, but we find this error to be harmless.

All three of these categories of evidence are clearly relevant to the defense's argument, and Gray fails to show any prejudicial effects outweighed their probative value.

*Inadmissible Evidence/Harmless Error*

We turn now to the two categories of evidence we believe would be prohibited by the collateral source rule. Gray correctly argues that in cases tried before a jury, La. R.S. 9:2800.27(F) prohibits the presentation of any evidence as to the identity of any person's payments of a plaintiff's medical bills to the jury prior to its verdict being rendered. For this reason, the invoices sent to Gray's attorney, Morris Bart, as well as the payments made by her attorney, should not have been allowed into evidence before the jury, nor should counsel have been allowed to include these items in argument. Further, as the identity of the party who paid Gray's medical bills is prohibited under the collateral source rule, we also find the evidence and testimony that show her providers refused at times to proceed with injections without prior payment from Gray's counsel would likely also violate La. R.S. 9:2800.27(F).

In finding La. R.S. 9:2800.27(F) is applicable to this kind of evidence, we must now determine if the trial court's error in allowing it requires reversal of the jury's verdict, or if it amounts to harmless error. Reversal of a jury's verdict is not warranted unless the trial court's error, when compared to the record in its entirety, was so substantial as to materially affect the outcome of the case; the complainant has the burden of proof. *Patterson v. State Farm Mut. Auto. Ins. Co.*, 51,620 (La. App. 2 Cir. 11/15/17), 244 So. 3d 800; *Ryan v. Case New Holland*, 51,062 (La. App. 2 Cir. 12/22/16), 211 So. 3d 611.

Considering the record in its entirety, we cannot say the inadmissible evidence and arguments materially impacted the jury's decision in this matter to such an extent as to require reversal as there was substantial available evidence favorable to the defense's position that Gray was not injured as a result of the accident.

The accident itself was a minor collision, with the parties traveling at a slow rate of speed at impact. Strong testified the vehicles merely "skinned" each other, and the photographs of the vehicles showed minor damage. Gray was out of her vehicle when Strong pulled into the bank after the collision, with Strong saying Gray appeared shaken, but not hurt. Gray told the police she was not injured and declined medical attention. Both vehicles were drivable, and Gray completed her bank deposit and drove home.

Gray did not experience any pain at all for three to four days after the accident, but then consulted an attorney before seeking medical treatment. During treatment, she continued to work the same hours as she did before as

a custodian with the manual duties described earlier.  Gray's doctors placed no physical restrictions upon her during treatment.

Dr. Domangue noted Gray previously reported bilateral shoulder pain in 2017 and 2021, as well as pain in her right hip as early as 2019; she also disclosed suffering from age-related arthritis.  He noted her range of motion was normal for someone of her age and work history, her pain had not been consistently documented in her medical records, and any relief she may have obtained from the many injections she received was not consistently documented.  He pointed out Gray reported to Traxler Chiropractic muscle spasms all over her entire spine following the accident, which he said would have warranted immediate medical attention, not chiropractic care.  Gray's MRI showed her neural foramen was patent, meaning there was no neurological impingement of her spine, and the X-ray taken in April 2023 showed "nothing new" beyond a mass on top of her sacrum, which no other physician noted or appeared to have reviewed.

Dr. Domangue, Dr. Bayonne, and Dr. Nunley all agreed Gray's MRI reflected her spine was in good shape and consistent with her age and work history.  Further, Dr. Bayonne noted Gray's MRI reflected "facet hypertrophy," which is commonly associated with age-related wear and tear.  Dr. Nunley testified Gray reported a history of arthritis, and she also reported working during the entirety of her treatment following the accident.  Gray had a negative Faber's test at Dr. Bayonne's office approximately one month prior to having a positive test at Dr. Nunley's, which Dr. Nunley was unaware of until defense counsel provided it at the deposition.  Dr. Nunley stated he recommended Gray seek physical therapy, but to his knowledge,

she did not do it. While Dr. Domangue claimed it was *possible* Gray was injured as a result of the collision, he never said it was *probable*.

The jury had significant evidence to conclude Gray was not injured as a result of this minor motor vehicle collision, irrespective of the evidence allowed in error. Consequently, we find this error to be harmless as it was not so substantial as to materially affect the outcome of the case.

This assignment of error is without merit.

## CONCLUSION

The jury verdict is affirmed. All costs are to be paid by the plaintiff, Doris Gray.

**AFFIRMED.**